UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Center for Biological Diversity,                          File No. 20-cv-2554 (ECT/BRT)

        Plaintiff,

v.

                                         **OPINION AND ORDER**

Sarah Strommen, in her official capacity as
Commissioner of the Minnesota Department
of Natural Resources,

        Defendant.

---

Collette L. Adkins and Marc D. Fink, Center for Biological Diversity, Duluth, MN, for Plaintiff Center for Biological Diversity.

Peter J. Farrell and Oliver J. Larson, Office of the Minnesota Attorney General, St. Paul, MN, for Defendant Sarah Strommen.

---

       This case is the second installment in a dispute over the impact that Minnesota's trapping regulations have on the state's population of Canada lynx.  A different court in this District previously ordered the Minnesota Department of Natural Resources to apply for a permit from the federal government that would allow "incidental take[s]" of the lynx and, pending a decision on that application, to adopt new trapping regulations meant to protect the lynx.  In this new action, the Center for Biological Diversity claims that the agency has not obtained a permit and that its revised regulations continue to result in unlawful harm to the lynx.  Defendant Sarah Strommen, in her official capacity as DNR Commissioner (referred to simply as "the DNR"), has moved to dismiss the Complaint,

arguing that the Center lacks standing to assert its claim, that the judgment in the prior case precludes the Center's claim, and that the Center has failed to plausibly allege a violation of the Endangered Species Act.

The DNR's motion will be denied. The Center has plausibly alleged an injury in fact—*i.e.*, ongoing harm to the lynx and associated harm to the aesthetic interests of the Center's members—that is caused by the DNR's trapping regulations and would be redressed by the injunctive relief it seeks. Because of unforeseen factual circumstances, most notably the Fish and Wildlife Service's failure to act on the DNR's application for an incidental take permit, the DNR has not established at this stage that *res judicata* bars the Center's claim. And the Center has plausibly alleged that additional, unpermitted takings of the lynx are likely if the DNR does not change its policies.

I[1]

The Canada lynx is a "rare wild cat" known for a distinctive appearance "characterized by tufted ears, hind legs that appear longer than front legs, and a pronounced goatee under the chin." Compl. ¶ 13 [ECF No. 1]. An estimated "50 to 200 lynx" reside in northern Minnesota, which is "one of the few places left in the United States that contains lynx habitat with the quality and quantity to sustain lynx populations." *Id.* ¶ 15. Since 2000, the Fish and Wildlife Service—one of the federal agencies responsible for

---

[1]     In accordance with the standards governing a motion to dismiss under Rule 12(b)(6) and a facial attack on subject-matter jurisdiction under Rule 12(b)(1), the facts are drawn entirely from the Complaint and documents embraced by it. *See Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014); *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990).

2

administering the Endangered Species Act—has considered the lynx to be a "threatened" species. *Id.* ¶ 14; *see* 16 U.S.C. § 1533(a); 65 Fed. Reg. 16,052 (Mar. 24, 2000). This designation gives the species certain protections under the Act—most notably, it makes it unlawful for "any person subject to the jurisdiction of the United States" to "take" the species "within the United States." 16 U.S.C. § 1538(a)(1)(B); 50 C.F.R. §§ 17.31(a), 17.40(k). The term "take" encompasses a wide range of actual or attempted conduct, including "trap[ping]." 16 U.S.C. § 1532(19); *see Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 697–99 (1995).

The Center for Biological Diversity is a "nonprofit organization dedicated to the protection and restoration of biodiversity." Compl. ¶ 5. At least some of its members "live, work, recreate, and study in areas throughout the lynx's current range in Minnesota." *Id.* ¶ 8. These members "enjoy seeing lynx . . . and would like to see the lynx population fully recover in Minnesota and across the country." *Id.*

Hoping to vindicate these interests, the Center and another organization sued the DNR in 2006, claiming that the agency, through its regulations, was "authorizing trapping that resulted in illegal incidental take of Canada lynx" in violation of the Endangered Species Act. *Id.* ¶ 22; *see* Farrell Decl., Ex. 1 [ECF No. 16-1]. Judge Davis eventually agreed, granting the Center's motions for summary judgment and injunctive relief. *See Animal Prot. Inst. v. Holsten*, 541 F. Supp. 2d 1073, 1081–82 (D. Minn. 2008). He ordered the DNR to

> promptly take all action necessary to insure no further taking
> of threatened Canada Lynx . . ., including, but not limited to:

3

> applying for an incidental take permit[2] for Canada Lynx on or
> before April 30, 2008 . . . and developing and preparing a
> proposal . . . to restrict, modify or eliminate the . . . incidental
> taking of Canada Lynx through trapping activities in the core
> Canada Lynx ranges.

*Id.* at 1081.

In response to that initial order, the DNR applied for an incidental take permit from the Fish and Wildlife Service and submitted a regulatory proposal to the court. Compl. ¶ 25; *see* Farrell Decl., Ex. 3 [ECF No. 16-3]. Judge Davis then ordered the DNR to promulgate its proposed regulations, with a few modifications not relevant here, on an emergency basis so that they would take effect by October 25, 2008. *Id.*, Ex. 6 [ECF No. 16-6]. These updated regulations were to remain in effect until one of four things happened: (1) the DNR received an incidental take permit; (2) the Fish and Wildlife Service issued a more general rule addressing incidental take of the lynx; (3) the lynx was delisted from protection under the Act; or (4) the court ordered otherwise. *Id.* at 4–5. To date, although nearly thirteen years have passed, the Fish and Wildlife Service has not acted on the DNR's permit application "despite the DNR's repeated requests that it do so," nor has it taken any of the other regulatory actions that Judge Davis contemplated in his order. Compl. ¶ 27; Farrell Decl., Ex. 9 at 4 [ECF No. 16-9].

---

2       An incidental take permit insulates the permit holder from liability under the Endangered Species Act for takings that are "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). In order to obtain one, an applicant must show that it will take steps to mitigate the impacts of such takings. *See id.* § 1539(a)(2)(A).

4

In December 2020, the Center filed this action.  In the Complaint, it acknowledges that the DNR has complied with Judge Davis's order, but it alleges that the agency's amended regulations have proven ineffective.  *See* Compl. ¶¶ 30, 37–39.  Specifically, although the DNR does not directly authorize the trapping of lynx, it "oversees licensing and regulation of trapping" for a variety of other species, and "[l]ynx are vulnerable to being caught in traps set for these other animals." *Id.* ¶¶ 31–36.  A number of lynx have been injured or killed by otherwise lawful traps, and because the DNR has not obtained an incidental take permit, the Center believes that the agency is continuing to violate the Endangered Species Act.  Compl. ¶¶ 41–55, 61–65.  The DNR has responded by filing a motion to dismiss the Complaint for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted.  ECF No. 13; *see* Fed. R. Civ. P. 12(b)(1), (b)(6).

## II

The first question is whether the Center has standing to raise its claim.[3]  Because the DNR challenges only the Complaint's sufficiency, this is a "facial" challenge to subject-matter jurisdiction. *Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914 (8th Cir. 2015).  In analyzing a facial challenge, a court "restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724,

---

[3]      Although this issue comes second in the DNR's briefs, it will be addressed first because "standing is a jurisdictional prerequisite that must be resolved before reaching the merits of a suit." *City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007).

729 n.6 (8th Cir. 1990) (citations omitted).  To plead Article III standing, a plaintiff must allege facts plausibly showing it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

The Center has adequately alleged an injury in fact, and the DNR does not argue otherwise.  An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted).  "[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Id.* at 562–63.  In the environmental context, "plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Kuehl v. Sellner*, 887 F.3d 845, 850 (8th Cir. 2018) (*quoting Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000)).  That's what the Center has done here.  Its members[4] "live, work, recreate, and study in areas throughout the lynx's current

---

[4]     "A membership organization may sue on behalf of its members if three criteria are satisfied.  Its members must have standing to sue, the interests it seeks to protect must be germane to its own purpose, and neither the claim asserted nor the relief requested may demand the participation of the individual members." *Nat'l Fed'n of Blind of Mo. v. Cross*, 184 F.3d 973, 981 (8th Cir. 1999).  The DNR does not contest that this case satisfies the latter two requirements.  Protecting the lynx is undoubtedly germane to the Center's purpose: the "protection and restoration of biodiversity." Compl. ¶ 5.  And nothing about the Center's claim or the declaratory and injunctive relief it seeks requires the participation of individual members.  As discussed below, the Center has also plausibly alleged that at least some of its members have standing to sue.

range in Minnesota." Compl. ¶ 8. They "frequently engage in hiking, camping, snowshoeing, skiing, wildlife watching, photography, dog-walking, and other activities, and will continue to do so." *Id.* They "enjoy seeing lynx . . . and would like to see the lynx population fully recover in Minnesota[.]" *Id.* And, according to the Center, "DNR-authorized trapping" harms those interests because it increases the number of lynx that are harmed or killed. *Id.* ¶¶ 9–10. No more is required to allege an injury in fact.

The Center has also adequately alleged that the DNR is causing its injury. To do so, it must allege that its injury is "fairly traceable" to the DNR's conduct, not just to "the independent action of some third party not before the court." *Digit. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 957 (8th Cir. 2015) (quoting *Lujan*, 504 U.S. at 560). Although the Center does not allege that the DNR itself trapped lynx or explicitly authorized the trapping of lynx,[5] it has alleged that the agency, which "oversees licensing and regulation of trapping in Minnesota," authorizes and even incentivizes the trapping of other animals. Compl. ¶¶ 31–33. The devices used to trap these other animals "can injure or kill Canada lynx," and the Center provides several examples of lynx being caught in lawful traps. *Id.* ¶¶ 34, 41–55. This causal connection between the DNR's regulatory decisions and the unlawful taking of lynx, while indirect, is sufficient for standing purposes. *See Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, 148 F.3d 1231, 1253 (11th Cir. 1998); *cf. Defs. of Wildlife v. Adm'r, E.P.A.*, 882 F.2d 1294, 1300–01 (8th Cir. 1989) (recognizing this theory of causation as a basis for liability under the Act); *Strahan*

---

[5]      In fact, "the DNR prohibits trapping of Canada lynx[.]" Compl. ¶ 32 (citing Minn. R. 6234.1500).

*v. Coxe*, 127 F.3d 155, 163 (1st Cir. 1997) (same); *Animal Prot. Inst.*, 541 F. Supp. 2d at 1078–79 (same).

According to the DNR, the Center has not adequately alleged causation for standing purposes because "[t]he source of the injuries that [it] alleges all flow from the DNR's authorization of trapping 'without the necessary permit' from the FWS." Def.'s Mem. in Supp. at 16 [ECF No. 15]. In other words, the DNR believes that the Center is only claiming to be injured by the DNR's lack of a permit, and that lack of a permit is only traceable to the Fish and Wildlife Service's inaction on the permit application. This argument conflates the Center's theory of injury with its theory of liability. The presence or absence of a permit may determine whether the DNR is liable for causing the Center's injury, but the lack of a permit, in itself, is not the injury that the Center is trying to prevent. The injury, as noted above, is the harm to the recreational and aesthetic interests of the Center's members that occurs when a lynx is harmed or killed. For the reasons already stated, that injury is fairly traceable to the DNR's trapping policies.

The DNR raises a similar argument concerning redressability. According to the DNR, the Center's injuries all flow from the DNR's lack of a permit, but because the responsibility for issuing a permit lies with the Fish and Wildlife Service, it is "merely speculative" that any order directed toward the DNR would have an effect. Def.'s Mem. in Supp. at 17–18 (quoting *Young Am. Corp. v. Affiliated Comput. Servs., Inc.*, 424 F.3d 840, 845 (8th Cir. 2005)). This argument, like DNR's causation argument, rests on a flawed premise: that the Center is primarily concerned about the lack of a permit. As explained above, the relevant injury is the harm to the lynx caused by the challenged

trapping policies, not the DNR's lack of a permit.  It is plausible that an order "[e]njoin[ing] the DNR from authorizing trapping that risks further injuries and death to Canada lynx," Compl. at 16 ¶ B ("Request for Relief"), would at least partially redress this injury even if the FWS never acts on the DNR's permit application.  *See Loggerhead Turtle*, 148 F.3d at 1253–55.

III

Now move to the DNR's principal argument, which is that the judgment in the Center's prior lawsuit bars its claim in this one.  "The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'"  *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008).  Res judicata is an affirmative defense that a defendant must plead and prove, but a court may nonetheless dismiss an action on this basis under Rule 12(b)(6) if the complaint (including documents that it embraces) establishes that the plaintiff's claims are precluded.  *C.H. Robinson Worldwide, Inc. v. Lobrano*, 695 F.3d 758, 764 (8th Cir. 2012).  Federal common-law rules govern the application of res judicata when, as here, a federal court presides over a federal-question case.  *Taylor*, 553 U.S. at 891.  To prevail, the DNR must show that "(1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) both suits involve the same parties (or those in privity with them); and (4) both suits are based upon the same claims or causes of action."  *Midwest Disability Initiative v. JANS Enters.*, 929 F.3d 603, 607 (8th Cir. 2019) (citation omitted).  The Parties agree that the first three requirements are satisfied.  *See* Def.'s Mem. in Supp. at 11–12; Pl.'s Mem. in

9

Opp'n at 12 [ECF No. 20].  They only dispute whether this case involves the "same claims or causes of action" as the prior lawsuit.

Two claims are the same for res judicata purposes if they "arise[] out of the same nucleus of operative facts[.]"  *Midwest Disability Initiative*, 929 F.3d at 610 (quoting *Yankton Sioux Tribe v. U.S. Dep't of Health & Human Servs.*, 533 F.3d 634, 641 (8th Cir. 2008)).  To decide if they do, a court "examines whether the second lawsuit is 'part of the transaction, or series of connected transactions, out of which the [first] action arose . . ., giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, [and] whether they form a convenient trial unit."  *First Nat'l Bank in Sioux Falls v. First Nat'l Bank S.D.*, 679 F.3d 763, 767 (8th Cir. 2012) (quoting *Lane v. Peterson*, 899 F.2d 737, 742 (8th Cir. 1990)); *see* Restatement (Second) of Judgments § 24 (June 2021 Update).  The "development of new material facts can mean that a new case and an otherwise similar previous case do not present the same claim."  *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2305 (2016).

Difficult problems can arise when a case involves a "substantially single course of activity" that "continue[s] through the life of a first suit and beyond."  18 Edward H. Cooper, *Federal Practice and Procedure* § 4409 (3d ed. April 2021 Update).  The general rule in this situation is that "a new claim or cause of action is created as the conduct continues" after the first judgment.  *Id.*  Some courts recognize an exception to this general rule when "the object of the first proceeding was to establish the legality of the continuing conduct into the future."  *Id.*; *see Hatch v. Boulder Town Council*, 471 F.3d 1142, 1150–51 (10th Cir. 2006).  Put differently, when a prior suit ends in a judgment resolving the

legality of conduct that will continue after the judgment, the plaintiff generally cannot challenge that same conduct again.  *See Yankton Sioux Tribe*, 533 F.3d at 641–43; *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 289–90 (2d Cir. 2000).  But even this principle is not absolute.   A claim involving continuing conduct that was the subject of a prior judgment may not be precluded "if unanticipated events so change the situation as to warrant further relief[.]"  18 Cooper, *supra*, § 4409; *see First Nat'l Bank*, 679 F.3d at 767–68.

The claims in this case are undoubtedly similar to those in the prior lawsuit.  They involve the same threatened species and the same theory of liability.  The nature of the challenged DNR conduct does not seem meaningfully different between the two cases.  Moreover, the prior judgment was, at least in some sense, meant to "establish the legality of the continuing conduct into the future."  18 Cooper, *supra*, § 4409.  Judge Davis's order was prospective in nature.  It required the DNR to promulgate new regulations on an emergency basis and to pursue a federal permit that would insulate the agency from legal liability.  And it said that, after the DNR took these steps, it would "be in compliance with Section 9 of the ESA."  Farrell Decl., Ex. 6 at 4.

Although it is a close call given these similarities, the DNR has not shown that the pleading-stage record establishes its affirmative defense of res judicata.  This is because the Fish and Wildlife Service's unforeseen inaction on the DNR's permit application amounts to a "changed circumstance" that differentiates the claims in this case for preclusion purposes.

The Service's inaction has given rise to two related and unanticipated consequences. First, it is apparent that, when the prior judgment was entered, everyone anticipated it would be a matter of months before the DNR had an incidental take permit. *See Animal Prot. Inst.*, 541 F. Supp. 2d at 1076 ("Once filed, it may take up to 10 months for the FWS to process the permit."). The emergency regulations were meant as an interim measure to minimize or eliminate the risk of harm to the lynx while DNR awaited a decision on its permit application. *See id.* at 1081–82; Farrell Decl., Ex. 6 at 4–5. Now that years have passed with no such decision, the temporary regulations have effectively become permanent.

Second, according to the Center's allegations, the once-temporary regulations have resulted in new unpermitted takings of the lynx. At the time of the prior judgment, there was no reason to consider the risk that, over time, the temporary regulations would lead to additional unpermitted takings. The reason, once again, was that no one thought the regulations would be in effect for any significant period of time before the DNR obtained its permit. Generally, each unpermitted taking violates the Endangered Species Act, *see* 16 U.S.C. § 1538(a)(1)(B); 50 C.F.R. § 17.31(a), and in view of the Parties' and the court's expectations, it seems fair to say that the new takings were "unanticipated." 18 Cooper, *supra*, § 4409; *see First Nat'l Bank*, 679 F.3d at 767–68. Given this context, the prior judgment—including Judge Davis's statement that the DNR would be "in compliance with Section 9 of the ESA" if it adopted the temporary regulations—cannot be understood to definitively resolve the lawfulness of the DNR's temporary regulations for all time.

The DNR responds that this case is more like the mine run of cases that address a prior judgment establishing the legality of continuing conduct.  Def.'s Mem. at 13–15.  It relies principally on *Yankton Sioux Tribe* and *Monahan*, but both cases are distinguishable. *Yankton Sioux Tribe* involved a challenge to the Indian Health Service's decision to shutter an emergency room that served a tribal community.  533 F.3d at 636–37.  A prior lawsuit ended with a permanent injunction requiring the Service to comply with a statutory procedural requirement that governed such closure decisions, and after the Service did so, the court dissolved the injunction.  *Id.* at 637–38.  Later, when the Service set a new closure date for the emergency room, the Tribe filed another lawsuit raising similar claims and arguing that the new closure date was a new material fact.  *Id.* at 638, 641.  The court rejected this argument, concluding that "the decision to close the [] emergency room was made only once," and "each proposed closure deadline," rather than a new circumstance giving rise to a new claim, was merely "part of the process intended to carry out the original decision."  *Id.* at 641.  The nature of the challenged conduct in this case is different.  The Center alleges that the DNR is causing new, unpermitted takings of the lynx that post-date the prior judgment.  The cause of these takings, according to the Center, are regulations that were promulgated in response to the prior judgment, not conduct that pre-dated the judgment.  And because of the Fish and Wildlife Service's inaction on the DNR's permit application, the takings are occurring under circumstances that neither the court nor the Parties contemplated when the prior judgment was entered.  *See Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70, 93 (D. Me. 2008) (reaching the same result in a remarkably similar lawsuit involving the Canada lynx); *accord First Nat'l Bank*, 679 F.3d at 767–68.

13

*Monahan* is also different.   In that case, city corrections officers brought a representative action raising facial and as-applied constitutional challenges to their department's sick-leave policy.  214 F.3d at 280.  A stipulated settlement of their lawsuit required the department to amend the policy in exchange for a with-prejudice dismissal of the constitutional claims.  *Id.* at 280–81.  Later, different officers asserted constitutional claims related to leave decisions made under the amended policy.  *Id.* at 282.  The court held that these claims were precluded because they fell "within the same queue as those of injured officers . . . under the earlier version."  *Id.* at 290.  Allowing the new claims to go forward, the court wrote, would undermine the "efficiencies created by [the] mutually agreeable settlement" in the prior suit.  *Id.* at 289.  In other words, the purpose of the settlement was to definitively resolve the constitutionality of the sick-leave policy absent further amendments or changes in controlling law, and enforcing preclusion would ensure that the new plaintiffs were "bound by their representative's decision" to settle.  *Id.* at 289–90.  Those finality concerns are not present here.  As discussed above, the regulatory changes required under the prior judgment were never meant to be permanent; their purpose was to bridge the gap between the judgment and the decision on the DNR's permit application.  The regulations have now effectively become permanent, but there has been no opportunity to examine their long-term effects.  Allowing the Center to pursue relief based on the new takings under these circumstances would not undermine the prior judgment's finality.

Finally, the DNR argues that, rather than filing a new action, the Center should have sought modification of the prior judgment under Federal Rule of Civil Procedure 60(b) or

14

60(d).  Def.'s Mem. in Supp. at 14–15 (citing *City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, 708 F. Supp. 2d 890, 897 (D. Minn. 2010)).  The Center certainly could have pursued that option,[6] but the DNR has cited no authority to support the proposition that the Center was required to do so when res judicata did not otherwise preclude a new action.

No doubt this case presents an unusual conceptual difficulty.  Normally, one thinks of "unanticipated events" as changes that have actually happened.  Here, we have the opposite problem.  The prior judgment rested on an assumption that certain changes would come, but they never did.  Under these unique circumstances, and in view of the burden of proof and the undeveloped record, the better answer is that the Center is not precluded from seeking additional relief in a new action.  If additional factual development makes it appropriate to revisit this issue, the DNR is free to raise it as an affirmative defense at summary judgment.

IV

The DNR's final argument is that the Center has failed to state a claim under the Endangered Species Act.  In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and

---

[6]     The Center argues that it would have been essentially impossible to obtain relief under Rule 60(b) given the amount of time that has passed since the prior judgment. Without weighing in on whether such relief would be appropriate, it is worth observing that, although Rule 60(b) motions must be brought within a "reasonable time," courts have recognized the need for a "flexible approach" to that standard in the unique context of "institutional reform litigation."  *Horne v. Flores*, 557 U.S. 433, 448–50 (2009) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 381 (1992)); *see Ahmad v. City of St. Louis*, 995 F.3d 635, 640–41 (8th Cir. 2021).

draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted).  Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).  The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Center claims it is entitled to a declaration that the DNR's policies violate the Endangered Species Act because they result in the unpermitted taking of Canada lynx and an injunction prohibiting the DNR "from authorizing trapping that risks further injuries and death to Canada lynx."  Compl. at 16 ¶¶ A–B.  To state a claim to this relief, the Center must allege facts plausibly showing that it is "likely that additional takings may occur unless further regulations are implemented." *Animal Prot. Inst.*, 541 F. Supp. 2d at 1081; *accord Ctr. for Biological Diversity v. Otter*, No. 1:14-CV-258-BLW, 2018 WL 539329, at *2 (D. Idaho Jan. 24, 2018); *Martin*, 588 F. Supp. 2d at 99.  The Parties seem to agree that, in theory, the Center can use allegations of past lynx takings to raise a reasonable inference that such takings are likely to recur.  *See* Pl.'s Mem. in Opp'n at 27 (citing *Porter v. Jones*, 319 F.3d 483, 491 (9th Cir. 2003)).  According to the DNR, however, the Center has alleged too few takings, spread across too many years, to make it plausible that any

16

more takings are likely.[7]  Def.'s Mem. in Supp. at 20; Def.'s Reply Mem. at 12–13 [ECF No. 24].

Viewing the allegations in the light most favorable to the Center, it has done enough to state a plausible claim for declaratory and injunctive relief.  The Center outlines fifteen instances of lynx in Minnesota being harmed or killed by traps between December 2009 and November 2018.  Compl. ¶¶ 41–55.  At least ten of these instances involved traps that complied with DNR regulations.  *Id.* ¶ 63.  (The Complaint does not say whether the other five instances of trapping involved unlawful practices.)  But there is reason to believe that even more lynx have been trapped.  "[M]any trapped lynx may go unreported by trappers," and the Fish and Wildlife Service has "estimated that for every reported incidental take of lynx, one incidental take remains unreported."  *Id.* ¶¶ 58–69.  Given these allegations and the procedural posture, it is reasonable to infer that the DNR's ongoing trapping policies are likely to result in additional takings of the lynx going forward.  *See Animal Prot. Inst.*, 541 F. Supp. 2d at 1081 (finding that injunctive relief was warranted at the summary-judgment stage based on 13 takings reported over a three-year period); *Animal Welfare Inst.*, 588 F. Supp. 2d at 109 (granting preliminary injunctive relief even though "only one lynx ha[d] been subject to a take" in the type of trap at issue); *see also Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, 896 F. Supp. 1170, 1180 (M.D. Fla. 1995) ("[T]he future threat of [even a] single taking is sufficient to invoke the authority of the [ESA].");  *cf. Ctr. for Biological Diversity*, 2018 WL 539329, at *3 (denying injunctive relief at the summary-

---

[7]     The DNR has not challenged the sufficiency of the Center's merits allegations on any other basis.

judgment stage because, of four reported lynx trappings, three were exempt from ESA liability).

## ORDER

Based on the foregoing, and on all the files, records, and proceedings in this case,

**IT IS ORDERED THAT** Defendant Sarah Strommen's Motion to Dismiss [ECF No. 13] is **DENIED**.


Dated:  August 19, 2021                     s/ Eric C. Tostrud
                                            Eric C. Tostrud
                                            United States District Court

18