UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

CENTER FOR BIOLOGICAL
DIVERSITY,

    Plaintiff,

  v.

SARAH STROMMEN, in her official capacity as Commissioner of the Minnesota Department of Natural Resources,

    Defendant,

and

MINNESOTA TRAPPERS ASSOCIATION, NATIONAL TRAPPERS ASSOCIATION, AND FUR TAKERS OF AMERICA, INC.

    Defendant-Intervenors.

CASE NO. 20-2554-ECT-JFD

**THE DNR'S RESPONSE TO THE INTERVENORS' OBJECTION TO THE CONSENT DECREE**

Plaintiff Center for Biological Diversity (the "Center") and Defendant Sarah Strommen, in her official capacity as Commissioner of the Minnesota Department of Natural Resources (the "DNR"), have moved the Court to approve a Consent Decree that would resolve this case. The Consent Decree is the culmination of months of negotiation between the Center and the DNR, with extensive input from subject matter experts.

The Minnesota Trappers Association, the National Trappers Association, and Fur Takers of America, Inc. (collectively, the "Trappers") intervened as Defendants after the original parties were deep into settlement negotiations—and 14 months after this lawsuit was filed. The Trappers now object to the proposed Consent Decree, seeking to undo the Center and the DNR's carefully negotiated resolution of a case that presents complex

factual, scientific, and legal issues.

The Court should overrule the Trappers' objections, deny their request for an evidentiary hearing, and approve the Consent Decree because it is fair, reasonable, and consistent with the governing law.

## FACTUAL AND PROCEDURAL BACKGROUND

***The First Round of Lynx Litigation.***  The DNR briefly recounts the relevant factual and procedural background to provide context for its response to the Trappers' objection. As this Court has observed, "[t]his case is the second installment in a dispute over the impact that Minnesota's trapping regulations have on the state's population of Canada lynx." ECF No. 26, Op. & Order Denying the DNR's Mot. to Dismiss ("MTD Order") at 1. In 2006 and 2007, the Center and another organization sued the DNR, alleging that the agency's trapping regulations led to the incidental take of Canada Lynx, in violation of the federal Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-44. *Id.* at 3. In 2008, Judge Davis granted the Center's motion for summary judgment, concluding that the DNR had violated (and was continuing to violate) "Section 9 of the [ESA] by authorizing trapping and snaring within the range of Canada Lynx in Minnesota." *Animal Prot. Inst. v. Holsten*, 541 F. Supp. 2d 1073, 1081 (D. Minn. 2008).

As a remedy, Judge Davis ordered the DNR to take two steps. First, he ordered the DNR to apply for an incidental take permit[1] from the U.S. Fish and Wildlife Service. *Id.*

---

[1] Under the ESA, the taking of a threatened or endangered species that is "incidental" to and not the purpose of otherwise lawful activity may be allowed. 16 U.S.C. § 1539(a)(1)(B). The safe harbor for "incidental" take liability requires a person to receive an incidental take permit from the U.S. Fish and Wildlife Service. *Id.*

Second, he ordered the DNR to "develop[] and prepare[] a proposal . . . to restrict, modify, or eliminate the incidental taking of Canada Lynx through trapping activities in the core Canada Lynx ranges." *Id.*

The DNR applied for the incidental take permit and submitted a proposal. *See* MTD Order at 4; Declaration of Peter J. Farrell dated July 1, 2022 ("Farrell Decl.") Exs 1-2. The main pillars of the proposal were the establishment of a Lynx Management Zone and the adoption of several trapping rules within the Lynx Management Zone that were designed to reduce the incidental take of Canada Lynx. *See* Ex. 1 at 4-6.

After briefing, Judge Davis approved the DNR's proposal (with small modifications that are not relevant here). *See* Order at 4; Farrell Decl. Ex. 3. He then ordered the DNR to implement the rule changes "pursuant to State law in a manner that will ensure that such rules are in full effect by October 25, 2008, the beginning of the 2008-09 trapping season." Farrell Decl. Ex. 3. The DNR implemented the rule changes pursuant to its expedited emergency rulemaking authority in Minn. Stat. § 84.027, subd. 13(b). *Id.* Ex. 5 at 3 ¶ 5 & Ex. 6 at 374-75. Since then, the agency has continued to use its expedited emergency rulemaking authority under Minn. Stat. § 84.027, subd. 13(b), to maintain the changes ordered by Judge Davis. *Id.* Ex. 7 at 929-30.

**The Second Round of Lynx Litigation.** On December 17, 2020, the Center sued the DNR for a second time, alleging that Minnesota's trapping regulations—even with the Court-ordered changes in 2008—were still leading to unlawful takes of Canada Lynx. *See* ECF No. 1. The DNR moved to dismiss the complaint as barred by the doctrine of claim preclusion. ECF Nos. 13, 15. The DNR also argued that the Center lacked standing, and

3

that the Complaint failed to state a claim upon which relief could be granted. *Id.*

On August 19, 2021, the Court denied the DNR's motion. *See* Order at 2. Shortly thereafter, the Center and the DNR began negotiating a potential resolution. The settlement negotiations lasted months and involved extensive input from subject matter experts. *See* Declaration of John D. Erb dated June 30, 2022 ("Erb Decl.") ¶ 7.

Meanwhile, on February 18, 2022—14 months after the complaint was filed—the Trappers sought to intervene. ECF No. 41. The DNR did not oppose intervention but reiterated to Magistrate Judge Docherty that the parties were "in advanced settlement negotiations." ECF No. 53 at 2. The DNR underscored that, under well-settled precedent, the Trappers could not preclude the Center and the DNR from reaching a negotiated resolution. *Id.* at 2-3.

On March 9, 2022, Magistrate Judge Docherty allowed the Trappers to intervene. ECF No. 52. Less than a month later, on April 6, 2022, the Center and the DNR informed Magistrate Judge Docherty that they had "reached agreement in principle on key terms and [would] work to put the rest of the detail into a final settlement agreement." ECF No. 62 at 1.

The parties spent the next two months negotiating the language of the proposed Consent Decree. On June 1, 2022, the parties moved the Court to approve the Decree. ECF Nos. 71, 72. The Trappers object.

## LEGAL STANDARD

"When reviewing a proposed consent decree, the trial court is to review the settlement for fairness, reasonableness, and adequacy." *EEOC v. Prod. Fabricators, Inc.*, 666 F.3d 1170, 1172 (8th Cir. 2012) (cleaned up). Although "a federal court is more than a recorder of contracts from whom parties can purchase injunctions," *id.* (cleaned up), "a district court does not examine 'whether the settlement is one which the court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute,'" *Brown v. Pfeiffer*, Case No. 19-cv-3132 (WMW/KMM), 2021 WL 4947785, at *2 (D. Minn. Oct. 25, 2021) (quoting *United States v. Cannons Eng'g Corp.*, 889 F.2d 79, 84 (1st Cir. 1990)). The district court should give due regard to the law's strong preference for settlement agreements. *See Prod. Fabricators*, 666 F.3d at 1172-73 (noting that "[t]he law strongly prefers settlement agreements").

Consent decrees are particularly appropriate in complex environmental litigation. *See, e.g.*, *United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1021 (8th Cir. 2002) (affirming district court's approval of consent decree in CERCLA litigation); *United States v. Union Elec. Co.*, 132 F.3d 422, 430 (8th Cir. 1997) (same); *United States v. Metro. St. Louis Sewer Dist.*, 952 F.2d 1040, 1046 (8th Cir. 1992) (same in Clean Water Act litigation). The decision to approve or reject a consent decree rests with the district court's sound discretion. *See Prod. Fabricators*, 666 F.3d at 1172.

# ARGUMENT

The Trappers lodge two objections to the Consent Decree—one procedural, the other substantive. Neither has merit. First, the DNR has the authority to adopt the additional trapping restrictions through its expedited emergency rulemaking authority in Minn. Stat. § 84.027, subd. 13(b).

Second, the proposed decree is substantively fair, reasonable, and consistent with the ESA. Contrary to the Trappers' claims, the additional snaring restrictions will not "eliminate any meaningful snaring" in the Lynx Management Zone. Instead, the additional snaring restrictions will eliminate the primary risk to Canada Lynx from trapping that has persisted since the Court-ordered rule changes in 2008. More fundamentally, the DNR, as the state's regulator of wild animals, has longstanding and well-settled authority to adopt these types of trapping regulations. *See Waldo v. Gould*, 206 N.W. 46, 47 (Minn. 1925) (noting that "the ownership of wild animals rests in the state for the benefit of all its people in common"); Minn. Stat. § 97A.025 (stating, in relevant part, that "[a] person may not acquire a property right in wild animals, or destroy them, unless authorized under the game and fish laws"). The Court should approve the Consent Decree and allow the DNR to exercise its well-settled regulatory authority.

**I.  THE DNR HAS THE AUTHORITY TO ADOPT ADDITIONAL TRAPPING RESTRICTIONS THROUGH EXPEDITED EMERGENCY RULEMAKING.**

The Trappers' first argument is that the adoption of five additional trapping restrictions is "prejudicial and harmful" because: (1) there is not "good cause" for emergency rulemaking; and (2) the Trappers and other citizens will not get to participate

6

in the rulemaking process. ECF No. 76, Resp. and Obj. to Proposed Consent Decree & Order ("Objection") at 2-4. The Trappers misapprehend the focus on the procedural fairness inquiry and mischaracterize the source of the DNR's rulemaking authority.

> **A. The DNR is authorized by state statute to adopt the proposed rules through expedited emergency rulemaking.**

As an initial matter, the focus of the procedural fairness inquiry is typically "whether the government and the settling defendant were 'negotiating in good faith and at arm's length' when crafting the proposed consent decree.'" *Brown*, 2021 WL 4947785, at *2 (quoting *BP Amoco*, 277 F.3d at 1020). The Trappers do not allege that the proposed Consent Decree was not negotiated in good faith and at arm's length. The Trappers' objection goes well beyond the typical scope of the Court's procedural fairness inquiry.

Regardless, the Trappers' procedural objection misunderstands the source of the DNR's rulemaking authority. The DNR is not adopting the trapping restrictions under general exemption from rulemaking for "good cause." Minn. Stat. § 14.388. Nor is the DNR adopting the trapping restrictions under its emergency rulemaking authority in Minn. Stat. § 84.027, subd. 13(a) and Minn. Stat. §§ 97A.0451 to 97A.0459. Instead, the DNR is adopting the additional trapping restrictions under its "expedited emergency" rulemaking authority under Minn. Stat. § 84.027, subd. 13(b).

The difference is critical. The DNR's emergency rulemaking authority for game-and-fish rules is set out in Minn. Stat. § 84.027, subd. 13(a). Subdivision 13(a) requires the DNR to comply with the procedural requirements of Minn. Stat. §§ 97A.0451 to 97A.0459. However, Minn. Stat. § 84.027, subd. 13(b) allows the DNR to conduct

7

expedited emergency rulemaking under certain circumstances:

> If conditions exist that do not allow the commissioner to comply with sections 97A.0451 to 97A.0459 . . the commissioner may adopt a rule under this subdivision by submitting the rule to the attorney general for review under section 97A.0455, publishing a notice in the State Register and filing the rule with the secretary of state and the Legislative Coordinating Commission, and complying with section 97A.0459, and including a statement of the emergency conditions and a copy of the rule in the notice.

Minn. Stat. § 84.027, subd. 13(b); *see also id.* subd. 13(c)-(g) (other procedural requirements for expedited emergency rulemaking).

Both emergency and expedited emergency rulemaking procedures are unique to DNR, with this dual authority made exclusive to the agency by the Minnesota legislature in 1995. *See* 1995 Minn. Laws ch. 233, art. 2, §§ 39-48. In that grant of authority, the legislature specifically provided DNR with the discretion to determine which rulemaking process was appropriate, depending upon the circumstances of the particular wildlife management activity that is the subject matter of the rulemaking.

Here, the DNR has determined that the expedited emergency rulemaking process is appropriate. First, the proposed Consent Decree requires the DNR to make the rule changes effective within 40 days of approval of the Consent Decree, which the expedited emergency rulemaking process will facilitate. *See* ECF No. 72, Proposed Consent Decree & Order ("Decree") § 5 ¶ 6. Second, expedited emergency rules last up to 18 months and may be renewed. *See* Minn. Stat. § 84.027, subd. 13(g). Emergency rules, by contrast, last for a maximum of one year. *See* Minn. Stat. § 97A.0458. The 18-month timeframe aligns better with the DNR's new effort to get an incidental take permit from the U.S. Fish & Wildlife Service. *See* Erb Decl. ¶ 7 (noting that the DNR's "current effort" to get an

8

incidental take permit). *See* Minn. Stat. § 84.027, subd. 13(b); *see also* Farrell Decl. Ex. 7 at 929-30. Third, the expedited emergency process gives the DNR more flexibility to modify trapping rules as part of the permitting process. *See* Minn. Stat. § 84.027, subd. 13(b); *see also* Farrell Decl. Ex. 7 at 929-30. And finally, the expedited emergency process allows the DNR to take account of annual assessments of biological data and field reports. *See* Farrell Decl. Ex. 7 at 929-30.

Importantly, there is significant agency precedent for use of the DNR's expedited emergency rulemaking authority in this context. To comply with the 2008 order from Judge Davis, the DNR used the expedited emergency rulemaking process to adopt the original set of trapping restrictions in the Lynx Management Zone. *See* Farrell Decl. Ex. 5 at ¶ 5 & Ex. 6 at 374-75. Likewise, the DNR has used the expedited rulemaking process to ensure that the trapping restrictions in the Lynx Management Zone remain in effect. *See, e.g.*, *id.* Ex. 7 at 929-30. Despite over a decade's worth of trapping restrictions in the Lynx Management Zone being implemented this way, the Trappers never raised an objection to the expedited emergency process. Surely it cannot be procedurally unfair to use the same process. Moreover, the expedited emergency rulemaking process is how the DNR regularly makes changes to game-and-fish rules. *See* Minn. Dep't of Nat. Res., *Documents*, https://www.dnr.state.mn.us/aboutdnr/laws_treaties/emergency_rules/docs.html (public copies of expedited emergency game-and-fish rules available for informal reference).[2]

---

[2] One of the reasons the DNR uses this process is because wildlife population numbers change over time, as do methods of harvest. Thus, to manage the state's wildlife resources, the DNR regulates both the numbers of animals that may be harvested and the method in which they are harvested. For example, when the state manages the walleye fishery in Mille Lacs Lake, it

9

### B. The Trappers rely on authorities that do not apply, and they will not be prejudiced by entry of the Consent Decree.

The Trappers ignore the DNR's specific statutory rulemaking authority in Minn. Stat. § 84.027, subd. 13(b) and cite a hodgepodge of statutes and cases that do not apply here. First, the trappers cite Minn. Stat. § 97A.0451, subd. 1. But this statute is not implicated because the Commissioner of the DNR, in her sound discretion, has determined that use of expedited emergency rulemaking authority under Minn. Stat. § 84.027, subd. 13(b), is warranted to resolve this litigation.

Second, the Trappers rely on *Jewish Community Action v. Comm'r of Public Safety*, 657 N.W.2d 604 (Minn. Ct. App. 2004), for the proposition that "good cause" for exempt rulemaking under Minn. Stat. § 14.388 does not exist. Section 14.388 appears in the Minnesota Administrative Procedure Act ("MAPA"). *See* Minn. Stat. ch. 14. It is one of the statutory provisions that supplies the default procedural law that applies when Minnesota state agencies determine that there is "good cause" to depart from MAPA's rulemaking requirements. *See* Minn. Stat. §§ 14.385-.3895 (exempt rules). But the DNR is not relying on the general "good cause" exemption from state rulemaking requirements under Minn. Stat. § 14.388. Instead, the DNR is relying on its *specific* statutory authority—unique to the DNR—that exists in Minn. Stat. § 84.027, subd. 13(b) for expedited emergency rulemaking. Indeed, MAPA recognizes that requirements for "good cause" rulemaking "do[] not apply to . . . game and fish rules of the commissioner of natural

---

regulates not only the number of walleye that can be harvested, but also the type of bait for other large fish that may be lawfully harvested, with the aim of reducing walleye take. *See* Minn. R. 6264.0400, subps. 4F, 4I.

10

resources adopted under section 84.027, subdivision 13, or sections 97A.0451 to 97A.0459." Minn. Stat. § 14.386.

Third, the Trappers claims of prejudice are belied by the record. The Trappers waited 14 months before they sought to intervene in this lawsuit—well after the parties were engaged in advanced settlement negotiations about potential rule changes in the Lynx Management Zone. *See* ECF No. 41. If the Trappers wanted a seat at the settlement table, they had ample time to intervene. They did not.

## II. THE PROPOSED CONSENT DECREE IS SUBSTANTIVELY FAIR AND REASONABLE AND NO EVIDENTIARY HEARING IS NECESSARY.

The Trappers next claim that they are entitled to an evidentiary hearing because there are "substantive factual issues with the provisions of the proposed Consent Decree." Objection at 5. The Trappers are wrong: their substantive objections have no merit, and they are not entitled to an evidentiary hearing.

### A. The Trappers' substantive objections have no merit.

First, the proposed Consent Decree is substantively fair, reasonable, and consistent with the governing law, *i.e.*, the ESA. As noted above, the scope of the district court's review of a proposed Consent Decree for substantive fairness and reasonableness is limited. *See* Legal Std. *supra* at 5. The district court examines "'(1) the basic legality of the decree; (2) whether the terms of the decree, including its enforcement mechanism, are clear; (3) whether the consent decree reflects a resolution of the actual claims in the complaint; and (4) whether the consent decree is tainted by improper collusion or corruption of some kind.'" *Brown*, 2021 WL 4947785, at *2 (quoting *SEC v. Citigroup Global Mkts., Inc.*,

752 F.3d 285, 294-95 (2d Cir. 2014)).[3]

The proposed Consent Decree satisfies this standard. The Trappers do not allege that the proposed Consent Decree is illegal; that the terms of the proposed Consent Decree are unclear; that the Consent Decree goes beyond the scope of the claims raised in the complaint; or that the proposed Consent Decree is tainted in any way.

The Trappers instead claim that the proposed Consent Decree "eliminate[s] any meaningful snaring in the Lynx Management Zone." Objection at 4. The Trappers specifically object to the additional trapping rules that are laid out in Paragraph 6(a)-(c) of the proposed Consent Decree.[4] They have submitted the Declaration of Bert Highland, Vice President of the Minnesota Trappers Association, in support of their objections. *See* ECF No. 78, Declaration of Bert Highland dated June 17, 2022 ("Highland Decl.").

The proposed Consent Decree will not eliminate snaring in the Lynx Management Zone. As the DNR's expert wildlife biologist John Erb explains, the rules in Paragraph 6(a)-(c) are designed to reduce the primary risk to Canada Lynx in the Lynx Management Zone that persisted after the Court-ordered regulatory changes in 2008.[5] *See* Erb. Decl.

---

[3] Although the cases draw a distinction between "substantive fairness" and "reasonableness," the inquiries substantially overlap. *See, e.g.*, Brown, 2021 WL 4947785, at *2. The cases show that the court's lodestars are whether the decree is, on the whole, a fair and reasonable resolution of the complaint's claims and not the product of self-dealing.

[4] The Trappers affirmatively state that they do not object to Paragraph 6(d), and they do not appear to have any objection to Paragraph 6(e). *See* Highland Decl. ¶ 13.

[5] To be clear, by entering into the Consent Decree, the DNR does not admit that it is liable under the ESA for any takes of Canada Lynx that have occurred in Minnesota since 2008. *See* Decree §¶ 5 (no admission of wrongdoing or liability). And, if this Court were to reject the Consent Decree, the DNR will litigate all of its defenses on the merits. Accordingly, nothing in this memorandum (or in the Consent Decree) should be construed as an admission of liability or wrongdoing or a waiver of any of the DNR's defenses. That

¶¶ 8-14.

Specifically, the data show that the 2008 regulatory changes have nearly eliminated incidental take of Canada Lynx in bodygrip traps and eliminated deaths in bodygrip traps. *See* Erb Decl. ¶ 8. Similarly, for foothold traps, the take frequency was reduced, and the death frequency was halved. *Id.*

The outlier was snares. While the take frequency was halved, the death frequency was not. *Id.* The proposed Consent Decree thus focuses on regulatory changes that will reduce the mortality risk to lynx unintentionally caught in snares. *Id.* ¶¶ 9, 11, 13-14. Specifically, the rule changes in Paragraph 6(a) will require trappers to use "cable restraints" when snaring, which will reduce mortality risk to lynx. *Id.* ¶ 14(a)-(d); *see also* ¶¶ 10-11. Likewise, the rule changes in Paragraph 6(b)—which prohibit snares from being anchored to a fence or tree and impose other location limitations—will "reduce[] the risk that a lynx can become partially or wholly suspended or wrap the snare tight around a solid object, thereby further reducing the risk of constricting blood vessels in the neck." *Id.* ¶ 14€. And the rule changes in Paragraph 6(c)—which prohibit snares from exceeding seven feet in length—will reduce the risk of "lunging-related injury and any associated mortality risk" from long snares. *Id.* ¶ 14(f).

The Trappers' objections to the proposed rule changes in Paragraph 6(a)-(c) are exaggerated, not grounded in science and data, and give no weight to the mortality risk to

---

said, the DNR does not dispute—and has never disputed—that Canada Lynx have, on rare occasion, been caught in traps set for other species since 2008. ECF No. 36, DNR Am. Ans. ¶¶ 41-56.

13

Canada Lynx from snares. *See id.* ¶ 15. Significantly, the Trappers' claim that the proposed rule changes in Paragraph 6(a)-(c) will "effectively eliminate" snaring in the Lynx Management Zone is inconsistent with the experience of other states, the DNR's own experience trapping other species with similar methods, the geography of northeastern Minnesota, and the standard practices when trappers engage in winter snaring. *Id.*

In sum, the proposed Consent Decree is a fair and reasonable resolution of the Center's claims. The proposed rules changed in Paragraph 6(a)-(c) are designed to address the primary risk to Canada Lynx—a threatened species under the ESA—from trapping that has persisted since the first round of Lynx litigation. The additional restrictions build off the rule changes that the DNR implemented in 2008, and they are grounded the DNR's extensive scientific and technical expertise. Accordingly, the Court should approve the Consent Decree as substantively fair, reasonable, and consistent with the ESA.

### B. The Court should deny the request for an evidentiary hearing.

For similar reasons, the Court should deny the Trappers' request for an evidentiary hearing. The district court has discretion to determine whether an evidentiary hearing is necessary before ruling on a proposed consent decree. *See BP Amoco*, 277 F.3d at 1017. In determining whether a hearing is necessary, the court "start[s] with the proposition that motions do not usually culminate in evidentiary hearings." *Cannons Eng'g Corp.*, 899 F.2d at 93-94 (cleaned up).[6] In short: "[d]istrict courts are busy places and makework

---

[6] While *United States v. Cannons Engineering Corp.* is a First Circuit decision, and therefore not binding on this Court, it has been cited several times by the Eighth Circuit and other judges in this District when determining whether to approve a Consent Decree. *See, e.g.*, *BP Amoco*, 277 F.3d at 1017; *Brown*, 2021 WL 4947785, at *2.

hearings are to be avoided." Id. *at 94*. The key question is whether an objector is "given a meaningful and sufficient opportunity to present arguments and submit evidence in opposition to the government's motion to enter the consent decree." *BP Amoco*, 277 F.3d at 1017.

That standard has been met here. The Trappers have been given an opportunity to present arguments and submit evidence opposing the proposed Consent Decree, and no purpose would be served by an evidentiary hearing. Indeed, Judge Davis did not hold an evidentiary hearing when he ordered the DNR to implement a much broader set of regulatory and programmatic changes to state trapping law after the first round of lynx litigation. *See* Farrell Decl. Ex. 3.

The Eighth Circuit's decision in *United States v. BP Amoco Oil PLC* is instructive. In that case, an intervenor argued that the district court improperly denied its motion for an evidentiary hearing in an environmental cleanup case under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675. *See* 277 F.3d at 1014. In the proposed consent decree, the United States, on behalf of the EPA, allocated 61% of the responsibility for the cleanup to the intervenor and 39% of the responsibility to various settling defendants. *Id.* at 1015. The intervenor claimed that an evidentiary hearing was the only way to rebut a nine-page declaration submitted by an EPA attorney that justified the liability allocation. *Id.* at 1016. The district court disagreed; the Eighth Circuit affirmed. The Eighth Circuit held that the intervenor had been given the opportunity to present argument and evidence and, even if live testimony might haven helpful, it was not an abuse of discretion to deny an evidentiary

15

hearing. *Id.* at 1017.

Other decisions arising from complex environmental litigation have reached the same conclusion. In *United States v. Union Elec. Co.*, for example, the Eighth Circuit held that the district court did not abuse its discretion in denying an intervenor's request for an evidentiary hearing. 132 F.3d 422, 430 (8th Cir. 1997). *Union Elec. Co.* involved another environmental cleanup case under CERCLA, and another intervenor that contested its share of liability. *Id.* at 428. The intervenor claimed an evidentiary hearing was necessary to fairly apportion liability for cleanup of the site. *Id.* at 429-430. The district court denied the intervenor's motion for an evidentiary hearing and approved the consent decree. *Id.* The Eighth Circuit affirmed, holding that "[t]he Intervenors had ample opportunity to file objections to the Proposed Consent Decree." *Id.* at 430. The Eighth Circuit underscored that the "right to intervene in this action . . . does not grant the intervenors an unconditional right to an evidentiary hearing." *Id.* (cleaned up).

The Eighth Circuit reached the same conclusion in *United States v. Metro. St. Louis Sewer Dist.*, 952 F.2d 1040, 1044 (8th Cir. 1992). The Trappers acknowledge *Metro St. Louis*, but try to distinguish it on the grounds that the case did not involve "substantive objections to the proposed consent decree." Objection at 5. But *BP Amoco* and *Union Elec. Co.* both show that the district court has the discretion to deny an evidentiary hearing—even if there are substantive objections about the allocation of monetary liability—if the objector has the opportunity to present argument and evidence. Moreover, the Trappers misread *Metro St. Louis Sewer District*. The Eighth Circuit's decision in that case did not turn on the lack of substantive objections. *See Metro St. Louis*, 952 F.2d at

16

1044. Instead, the Eighth Circuit stressed the same principles highlighted in its later precedents: once an intervenor has the opportunity to file objections, there is "little else" to be done, and an evidentiary hearing is not necessary. *Id.*

So too here. The Trappers have had the opportunity to object to the Consent Decree. Those objections have no merit, and the request for an evidentiary hearing should be denied.

## CONCLUSION

For the foregoing reasons, the Court should reject the Trappers' objection to the proposed Consent Decree, deny their request for an evidentiary hearing, and approve the proposed Consent Decree as fair, reasonable, and consistent with the ESA.

Dated: July 1, 2022

        KEITH ELLISON
        Attorney General
        State of Minnesota

        /s/ *Pete Farrell*
        PETER J. FARRELL
        Assistant Attorney General
        Atty. Reg. No. 0393071

        445 Minnesota Street, Suite 1400
        St. Paul, Minnesota 55101-2131
        (651) 757-1424 (Voice)
        (651) 297-4139 (Fax)
        peter.farrell@ag.state.mn.us

        *Attorneys for Defendant Sarah Strommen, in her official capacity as the Commissioner of the Minnesota Department of Natural Resources*