## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

CENTER FOR BIOLOGICAL
DIVERSITY,

        Plaintiff,

  v.

SARAH STROMMEN, in her official
capacity as Commissioner of the Minnesota
Department of Natural Resources,

        Defendant,

and

MINNESOTA TRAPPERS
ASSOCIATION, NATIONAL TRAPPERS
ASSOCIATION, AND FUR TAKERS OF
AMERICA, INC.

        Defendant-Intervenors.

CASE NO. 20-2554-ECT-JFD

**DECLARATION OF JOHN D. ERB
IN SUPPORT OF THE DNR'S
RESPONSE TO THE TRAPPERS'
OBJECTION TO THE CONSENT
DECREE**

I, John D. Erb, hereby declare as follows pursuant to 28 U.S.C. § 1746:

1.     I am a Wildlife Research Scientist for the Division of Fish and Wildlife, Minnesota Department of Natural Resources ("DNR"). I office at 1201 East Highway 2, Grand Rapids, Minnesota, 55744. I have been a Wildlife Research Scientist for DNR since October 1998.

2.     I hold a Ph.D. in Zoology and Physiology from the Department of Zoology and Physiology of the University of Wyoming. My Master's Degree in Wildlife Ecology was obtained from the University of Missouri Columbia. My Bachelor of Science degree in Fisheries and Wildlife Biology was obtained from Iowa State University.

3.      Since 2001, as a Wildlife Research Biologist for the DNR, I have coordinated wolf and furbearer population monitoring and research activities, among other related duties.  I also coordinate or am involved in DNR's data collection and publication of annual harvest reports that include harvest of furbearers by trapping, and I am very involved in discussions and decisions regarding trapping seasons and regulations for all furbearers.

4.      In addition to my primary job responsibilities, I have been a member of the Association of Wildlife Agencies ("AFWA") U.S. Furbearer Conservation Technical Work Group ("TWG") for approximately 20 years and served as the Chair of the TWG for the past six years.  The TWG, among other tasks, has worked for 25 years conducting research on trap performance pursuant to international standards and commitments, and ultimately the development of Best Management Practices for Trapping ("BMPs"). This includes research on the performance of foothold traps, live-restraining snares or "cable restraints", foot snares, and cage traps on nearly all furbearer species in the U.S.  The TWG, including myself, was also involved in the original development of the brochure entitled "How to Avoid the Incidental Take of Lynx."  Attached as **Exhibit 1** is a true and correct copy of "How to Avoid the Incidental Take of Lynx."

5.      I have also been an avocational trapper for 40 years and have trapped numerous species in 4 different states.  In addition, I have used traps of various types in the live capture of wildlife for research for over 20 years.

6.      I served as an expert witness in *Animal Prot. Inst. v. Holsten*, Civil No. 06-3776 (MJD/RLE) (D. Minn.), and I was involved in the development of the Proposal of the DNR to Restrict, Modify, or Eliminate the Incidental Take of Canada Lynx that was

prepared in response to Judge Davis's order in that litigation. Among other things, the regulatory changes in 2008 included the establishment of the Lynx Management Zone, which is "[t]hat portion of the state lying north and east of a line beginning at U.S. Highway 53 at the east boundary of the state, thence along U.S. Highway 53 to the north boundary of the state," Minn. R. 6234.1000, subp. 5, and several trapping rules within the Lynx Management Zone that were designed to reduce take and mortality risk to Canada lynx from the trapping of other species.

7.      I have been involved in developing the additional trapping rules that appear in Paragraph 6(a)-(e) of the Proposed Consent Decree in this current lawsuit. I am also involved in the DNR's current effort to obtain an incidental take permit related to Canada lynx from the U.S. Fish and Wildlife Service ("USFWS").

8.      I maintain a database of information provided from numerous sources, including DNR and USFWS enforcement authorities, on the take and mortality of Canada lynx in the State of Minnesota through trapping, hunting, railroad and highway kills. Based on that data, I have prepared the following tables on take frequency and death frequency before and after the DNR implemented the court-ordered regulatory changes in 2008 (*i.e.*, 2002-2007 v 2008-2020).

|  | Average # of Takes/Year | |
|---|---|---|
|  | 2002 to 2007 | 2008 to 2020 |
| Bodygrip traps | 0.83 | 0.08 |
| Foothold traps | 0.67 | 0.62 |
| Snares | 0.83 | 0.46 |
| Total | 2.33 | 1.23 |

|  | Average # of Deaths/Year | |
|---|---|---|
|  | 2002 to 2007 | 2008 to 2020 |

| | | |
|---|---|---|
| Bodygrip traps | 0.33 | 0.00 |
| Foothold traps | 0.17 | 0.08 |
| Snares | 0.50 | 0.50 |
| Total | 1 | 0.54 |

9.      The above data shows both the rarity and reduction of takes, and near elimination of mortalities, since 2008.   My professional opinion was that the most appropriate focus for any attempts to further reduce mortality risk for accidentally captured lynx was on snaring regulations.  After the previous regulatory changes were made in 2008, mortality associated with snares has averaged one death every other year, with the only other mortality in 13 years being associated with apparent injury or stress associated with release of a single lynx restrained in a foothold trap.

10.      "Cable restraints" are snares modified in their design and/or placement with the intent of changing the performance from lethal to non-lethal.  There is no "official" definition of what constitutes a "cable restraint," but numerous features or setting methods have been identified from existing research and expert opinion that appear to reduce the lethality of snares when desired.  These features are summarized in a document that I (primarily) authored entitled "Modern Snares for Capturing Mammals: Definitions, Mechanical Attributes, and Use Considerations" on behalf of AFWA and the TWG after review of scientific literature, consultation with biologists in other states, and discussion with expert trappers and snare manufacturers.  A true and correct copy of the article is attached as **Exhibit 2** to this declaration.

11.      Based on 1) experiences relayed to me from biologists in other states where cable restraints are required for various reasons, 2) Best Management Practices ("BMP") trap performance research I have been involved with for 20 years, and 3) personal

experience with live restraint of several species for research, the use of "cable restraints" will reduce the mortality risk to lynx accidentally captured in cable devices. Although we lack scientific data on performance of cable restraints on lynx, we now have increasing data on numerous other species (bobcats, coyotes, foxes, raccoons, etc.), which supports my opinion. In addition, DNR successfully uses cable restraints to live-capture wolves for research in winter.

12.     Regulatory changes associated with snares in the Lynx Management Zone following the 2008 lawsuit had components designed to reduce both the capture and mortality of lynx in snares. These included:  1) prohibition of thinner diameter cables (thought to reduce constriction potential and mortality risk); 2) preventing placement of snare loops smaller than 8" diameter (thought to reduce risk of a neck catch [mortality risk] or increase the likelihood a lynx would step entirely through the snare loop); 3) snares (all traps) securely staked/anchored (no trap drags allowed) to reduce risk of not locating a captured animal (affecting mortality or injury risk) if, for example, snowfall covered signs of where the animal moved to before getting "hung up" in the forest; and 4) restriction on whether or which visual and olfactory attractants could be used at trap sets (all trap types) to reduce risk of capture.

13.     Due to other confounding uncertainties (e.g., variability in species-specific or overall trapper effort, variability in use of various trap types or methods, changes to lynx population size, changes in trapper awareness and vigilance), it is difficult to assess true cause-effect relationships with trapping regulations and accidental lynx take. Nevertheless, the data set forth in Paragraph 8 above suggests that previous changes were successful at

reducing both capture and mortality risk for lynx in most trap types.  The primary exception is that apparent mortality rate in snares remained unchanged, even though capture rate in snares declined.  This is the primary reason why the proposed Consent Decree focuses on reduction in mortality risk for lynx captured in snares.

14.     Each of the additional proposed regulatory changes to snare regulations in the consent decree are known or believed to reduce mortality risk (see Exhibit 2 for additional information), as follows:

a.  *Paragraph 6a, proposed Consent Decree:* With some exceptions, require a loop stop to mechanically prevent the loop from being able to close to a diameter <3.25".  This will reduce mortality risk caused by constricting blood vessels in the neck.

b.  *Paragraph 6a, proposed Consent Decree:* With some exceptions, prohibit the use of 2-piece (hinged) snare locks (e.g., cam locks).  These locks were designed in part to increase the lethality of a snare.

c.  *Paragraph 6a, proposed Consent Decree:* With some exceptions, prohibit the attachment of any type of compression spring to the snare or snare lock. Compression springs are designed to increase lethality by applying a closing force (once compressed by animal) that continues to tighten/constrict even when the animal stops pulling.

d.  *Paragraph 6a, proposed Consent Decree:* With some exceptions, prohibit the use of any lock that has a width < ½".  As with cable diameter, cables

and locks with wider/more surface area disperse a given force onto a larger area and reduce constriction pressure per unit area.

e. *Paragraph 6b, proposed Consent Decree:* With some exceptions, snares must be placed where they cannot reach entanglement. This reduces the risk that a lynx can become partially or wholly suspended or wrap the snare tight around a solid object, thereby further reducing the risk of constricting blood vessels in the neck.

f. *Paragraph 6c, proposed Consent Decree:* With some exceptions, snares may not exceed 7' in length. Long snares increase the risk of lunging-related injury and any associated mortality risk.

g. *Paragraph 6d, proposed Consent Decree:* With some exceptions, snares must have a swivel installed. Swivels can reduce injury (and hence mortality risk) by allowing the cable to freely turn if an animal twists or rolls.

15. In response to these proposals, Defendant Intervenors have offered several concerns or objections. My professional thoughts on those concerns or objections are as follows:

a. *A loop stop will provide harm to a lynx*[1] – I acknowledge that there is potential for a loose-fitting cable restraint with a "stop" on the cable to cause some abrasion on the animal. But I am not aware of any data to suggest that

---

[1] ECF No. 76, Defendant Intervenors Minnesota Trappers Association, National Trappers Association, and Fur Takers of America, Inc.'s Response and Objection to Proposed Consent Decree and Proposed Order (the "Objection") at 5; ECF No. 78, Declaration of Bert Highland on Behalf of the Minnesota Trappers Association ("Highland Decl.") ¶ 10.

harm is common or severe.  Based on a 2016 national trapping regulations survey by AFWA, approximately 1/3 of states requires some type of a minimum loop stop on snares, albeit with varying diameters and for varying reasons.  Attached as **Exhibit 3** is a true and correct copy of the survey, which is part of a document entitled "2016 Summary of Furbearer Trapping Regulations in the United States."  The relevant data is on pp. 100.  In addition, cable restraints with loop stops are often advertised by snare manufacturers for the humane live restraint of coyotes.  Finally, DNR has been using "cable restraints" with a loop stop to live capture wolves for research the past seven years, and we have not observed any noteworthy injuries from a loop stop.

b.   *The proposed restrictions limit the number of snare locks and will "require trappers to essentially use only one snare lock"[2]* – I agree that the snare lock restrictions will reduce the number of lock choices available to trappers and require some to alter or replace snares they already possess.  However, based on my assessment, there will still be at least 6 commonly used locks available to trappers (e.g., multiple styles of "washer lock," Berkshire Sure Lock, BMI Slide-Free Lock, Gregerson Lock, Thompson Lock, etc.).

c.   *Larger locks will be seen/avoided by animals, and snares with larger locks won't close as fast[3]* – I am not aware of scientific data on this subject but

---

[2] Objection at 5; Highland Decl. ¶ 10.
[3] Highland Decl. ¶ 10.

note that locks that are ≥ ½" were 5 of the top 7 locks listed as being commonly used by trappers in a 2015 national trap use survey by AFWA, suggesting that they are effective locks even if larger or more visual. Attached as **Exhibit 4** is a true and correct copy of the survey, which appears in a document entitled "Trap Use, Furbearers Trapped, and Trapper Characteristics in the United States." The relevant survey data is on pp. 101. In my experience, larger locks also sometimes close faster due to their increased weight. Finally, I note that the lock we use to live-capture wolves for research is over 1 inch in diameter, and though we have not compared effectiveness to other locks, we have live-captured approximately 50 wolves (a very wary animal) in those devices, and as part of the TWGs research on trapping BMPs, some locks larger than ½" have met BMP capture efficiency standards for foxes and coyotes (and no larger locks have yet failed efficiency standards).

d. *The prohibition on locks with moving parts or compression springs will allow more coyotes to chew out of snares and run off with the snare attached[4]* – I acknowledge and agree that the potential for this to occur is higher with animals, primarily wolves or coyotes, that are alive in a cable restraint. But I believe the concern is minimal for the following reasons.

---

[4] Objection at 5-6; Highland Decl. ¶ 10.

i. First, snares are already required to have breakaway devices designed to increase the likelihood that wolves will break completely free of a snare (or cable restraint) if accidentally captured.

ii. Second, coyote numbers and trapping are comparatively low in the Lynx Management Zone.

iii. Third, both coyote researchers and avocational trappers live-capturing coyotes for the "live market" commonly use cable restraints for capture, suggesting the frequency of cable chew-outs is low.

iv. Fourth, trappers not already using it can alter the type of cable they use (for example, from 7X7 to 1X19 design) which is more resistant to cable chewing.

v. Finally, should a coyote chew through a cable restraint and run off with the loop still attached to its neck, my professional opinion at this time is that the loop stop will prevent concerns of constriction injury or death to the animal, acting much like a fitted radio-collar on an animal or a necklace on a human.

e. *Prohibiting the anchoring of snares to larger trees or fence posts, where they can reach rooted vegetation > ½" when fully extended, and limiting their length to no more than 7', will make snaring "ineffective"*[5] - I agree that these proposed changes will reduce the number of locations available to trappers for setting snares, or at least increase the effort in setting them in

---

[5] Objection at 6; Highland Decl. ¶¶ 11-12.

some locations.  However, I disagree with the extent of the impact for the following reasons.

  i.  First, similar regulations are in place in other states (e.g., WI, PA, MO) for other reasons, and I am not aware of any evidence that these cable restraints are ineffective or wholly ineffective.

  ii.  Second, we utilize similar methods for live-restraining wolves, including in northeastern Minnesota, and though driving stakes in frozen ground can indeed be difficult at times, we regularly do so.  I have also, as part of my personal trapping, commonly anchored snares in ice (depending on ice depth) using cable stakes in drilled holes or using various ice anchors.

  iii.  Third, the proposed regulations do not prevent setting traps near brush, just that such brush (if > ½") cannot be rooted.  It can be cut and pushed back into the ground (if unfrozen, or by first pounding a small hole if frozen), or simply pushed into the snow when present.  Again, we commonly do this when live-snaring wolves.

  iv.  Fourth, trappers in many parts of the country commonly snare coyotes, foxes, and bobcats in comparatively open or grassy landscapes.  Though such locations are less common in northern Minnesota, they do exist in various forms (marshes, meadows, bogs, recent clearcuts, beaver dams or pond edges, lake edges, etc.)

throughout northeastern Minnesota and can be utilized by trappers as we often do when live-snaring wolves.

v. Finally, winter snaring in northern Minnesota (and other states) often involves the use of a "bait station" to attract animals to a location. As such, trappers can, and commonly do, "control" the location where cable restraints will be set. They can thus select sites that will minimize the need to remove excess brush around a set/bait location.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  06/30/22

JOHN D. ERB