UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

CENTER FOR BIOLOGICAL
DIVERSITY,

    Plaintiff,

  v.

SARAH STROMMEN, in her official
capacity as Commissioner of the Minnesota
Department of Natural Resources,

    Defendant,

and

MINNESOTA TRAPPERS
ASSOCIATION, NATIONAL TRAPPERS
ASSOCIATION, AND FUR TAKERS OF
AMERICA, INC.,

    Defendant-Intervenors.

CASE NO. 20-2554-ECT-JFD

**THE CENTER'S POST-HEARING REPLY IN SUPPORT OF JOINT MOTION FOR ENTRY OF CONSENT DECREE**

The Center's opening memorandum summarizes the uncontradicted record evidence establishing the DNR's liability under ESA Section 9 for at least nine unpermitted captures of Canada lynx since 2008. Center Br. (Dkt. 112) at 10-14. The Trappers do not even attempt to rebut the Center's arguments on liability.

The Trappers instead argue that the Proposed Consent Decree would not have prevented the lynx captures. However, as explained below, that is not the standard the Court applies when evaluating a consent decree, and nevertheless, the Decree's terms would likely have prevented some past captures.

The Trappers tell the Court that it cannot approve the settlement unless "the

consent decree's proposed new rules would have actually prevented harm (injury or death)" to lynx. *See, e.g.*, Trapper Br. (Dkt. 115) at 7, 8. But to approve a consent decree, the Court need only find that the settlement would be fair, reasonable, and consistent with governing law. The Center and the DNR have met this standard with evidence in the record proving that the new restrictions would reduce trapping risk to Canada lynx consistent with the ESA. Center Br. at 14-18; DNR Br. (Dkt. 113) at 11-18.

The Trappers are also wrong to ask the Court to apply the standard for issuing injunctive relief under the ESA. The Decree reflects a compromise. Its terms do not need to be on par with some hypothetical order for injunctive relief that the Court could enter if the Center were to prevail on the merits. That would amount to the Court resolving the merits of the Center's underlying claim for relief, which is impermissible when analyzing a consent decree. Center Br. at 10; *see also Turtle Island Restoration Network v. United States DOC*, 834 F. Supp. 2d 1004, 1021 (D. Haw. 2011), *aff'd*, 672 F.3d 1160 (9th Cir. 2012) (analyzing the reasonableness of a consent decree aimed at reducing incidental take of ESA-protected loggerhead turtles without applying the standard for injunctive relief).

Even so, the circumstances here justify injunctive relief because the record shows that "additional takes of lynx will occur in the future." *Animal Prot. Inst. v. Holsten*, 541 F. Supp. 2d 1073, 1080 (D. Minn. 2008). The Eighth Circuit holds that evidence of past takings demonstrates the requisite likelihood of future harm. *Defs. of Wildlife v. Adm'r, EPA*, 882 F.2d 1294, 1301 (8th Cir. 1989) ("We thus agree with the district court that the EPA's actions resulted in takings that violated the ESA. The court properly enjoined the EPA from continuing strychnine registrations under these circumstances."); *see also, e.g.*,

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818-20 (9th Cir. 2018) ("Irreparable harm requires a showing that the harm 'is *likely* in the absence of the injunction.'"); *Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70, 109 (D. Me. 2008) ("Although only one lynx has been subject to a take, it is reasonably foreseeable that other lynx will be subject to future takes in the event the regulations are not amended.").[1]

Here, Dr. Erb testified that additional lynx deaths will occur without changes to the DNR's trapping program. Tr. 175-77. His conclusion is supported by record evidence that lynx have been killed in traps set according to the DNR's regulations in place since 2008. Center Br. at 13; Ex. D-23. Thus, there can be no serious question that these past deaths establish likelihood of future takes without further trapping restrictions.[2]

In the 2008 case, the Court explained that an injunction should be "precisely tailored to remedy the precise violation of the DNR." *Animal Prot. Inst.*, 541 F. Supp. 2d at 1080. Here, Dr. Erb analyzed the data on lynx captures and concluded that the Decree should focus on mortality risk from neck snares. *See* DNR Br. at 10-11; Ex. D-23. If the

---

[1] The Trappers misstate the relevant standard for injunctive relief by attributing a quote from a 30-year-old out-of-circuit case to the District of Minnesota. Trappers Br. at 6. They also confuse the harm needed to justify injunctive relief with "harm" as used in the ESA's definition of take, 16 U.S.C. § 1532(19). The lynx captures do not need to satisfy the ESA's regulatory definition of "harm" because Section 9 explicitly prohibits actions that "wound, kill, trap, [or] capture" any listed species. *Id*. In any event, deaths are undoubtedly "harm" in any sense of the word.

[2] Uncontradicted evidence of lynx deaths justifies injunctive relief so further evidence of injuries is unneeded. Nevertheless, the record shows that animals caught in leghold traps experience injuries that include, for example, bone fractures and chipped teeth. Center Br. at 17. This evidence cannot be overcome by the Trappers' unsupported argument that any lynx released alive "therefore was not harmed." Trappers Br. at 7.

Decree instead focused on Conibear or cage traps, then maybe the Trappers would have a defensible argument about tailoring. But the nine unpermitted captures that the Center primarily relies upon to establish the DNR's liability occurred in neck snares and leghold traps, perfectly aligning with the focus of the Decree. Center Br. at 13. The fact that the Decree applies only in the Lynx Management Zone, where most lynx live, also shows that its terms are tailored.

Moreover, it does not make sense for the Trappers to argue that the Decree's trapping restrictions would need to have prevented the past takes, as the logical implication of their argument is that the Decree does not go far enough in restricting trapping. Their own witness testified that the only way to prevent illegal capture of lynx is to ban trapping where lynx occur. Tr. 226. Moreover, injunctive relief is forward looking, focused on reducing or eliminating the risk of *future* takes. *See, e.g.*, *Kuehl v. Sellner*, 161 F. Supp. 3d 678, 718 (N.D. Iowa 2016) ("To prevent further 'taking' in violation of the ESA, Plaintiffs are entitled to declaratory judgment and injunctive relief."); *Animal Prot. Inst.*, 541 F. Supp. 2d at 1081 ("The DNR shall promptly take all action necessary to insure no further taking of threatened Canada Lynx by trapping or snaring activities within the core Canada Lynx ranges.").

Even if the Decree's potential to have prevented the past lynx deaths is relevant, the record shows that some deaths may have been prevented if it had been in effect. The incident that occurred on December 1, 2017, involved a lynx that died in a neck snare, set in the Zone, without a loop stop, entangled in nearby vegetation, and thus noncompliant with the Decree's terms. Ex. D-19. For the snaring incident that occurred in the Zone on

4

February 15, 2014, the record does not contain enough details to know whether the neck snare was set in compliance with the terms of the Decree. Exs. D-13, D-14. Nevertheless, this incident provides further evidence that the Decree appropriately focuses on reducing lethality of neck snares. Regarding the incident on December 29, 2014, the Trappers' brief inaccurately characterizes the incident report, which in fact describes the snare as lacking a loop stop. Ex. D-17.

The DNR's brief summarizes the abundant evidence establishing that the Decree's requirements for neck snare design and placement reduce the risk of killing lynx. DNR Br. at 11-18. The Trappers appear to concede that the Decree's terms would reduce the lethality of neck snares. Their rebuttal is that Mr. Highland prefers to use snares that "kill quickly." *E.g.*, Tr. 223. At bottom, the Trappers' objection shows exactly why the Decree's changes are needed.

The Trappers' final objection to the Decree is that its terms "would put an immense burden on trapping in the Lynx Management Zone, such that there would be no meaningful trapping of lawful species." Trappers Br. at 12. Their exaggeration lacks support in the record. Even their own witness testified that he would still trap in the Zone, switching from neck snares to foothold traps. Tr. 225. The Decree leaves untouched numerous opportunities for trapping in and outside of the Zone. Center Br. at 18-19. Moreover, in nearly all other states with lynx, trappers cope with statewide bans on lethal neck snares. Center Br. at 22-23. The compromise reached by the Center and the DNR – that restricts neck snares in only part of the lynx's range in the state – is preeminently reasonable in comparison.

## CONCLUSION

The Proposed Consent Decree meets the standard for entry because it reasonably reduces risks to lynx from the very devices that continue to result in unpermitted take of Canada lynx, namely, neck snares and leghold traps. The Trappers invent a self-serving standard for evaluating the settlement and then misstate the record when applying the facts. They provide no basis for rejecting the Decree.

Respectfully submitted this 10th day of January, 2023.

/s/ *Collette Adkins*
Collette L. Adkins (#035059X)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 595
Circle Pines, MN 55014-0595
(651) 955-3821
cadkins@biologicaldiversity.org

Marc D. Fink (MN License No. 0343407)
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
(218) 464-0539
mfink@biologicaldiversity.org

*Attorneys for Plaintiff Center for Biological Diversity*