UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Center for Biological Diversity,                    File No. 20-cv-2554 (ECT/JFD)

       Plaintiff,

v.                                                  **OPINION AND ORDER**

Sarah Strommen, *in her official capacity*
*as Commissioner of the Minnesota*
*Department of Natural Resources*,

       Defendant,

and

Minnesota Trappers Association, National
Trappers Association, and Fur Takers of
America, Inc.,

       Intervenor Defendants.

---

Collette Lucille Adkins, Center for Biological Diversity, Circle Pines, MN, and Marc D. Fink, Center for Biological Diversity, Duluth, MN, for Plaintiff Center for Biological Diversity.

Peter J. Farrell and Oliver J. Larson, Minnesota Attorney General's Office, St. Paul, MN, for Defendant Sarah Strommen.

Gary R. Leistico and Jayne E. Esch, Leistico & Esch PLLC, Clear Lake, MN, for Intervenor Defendants Minnesota Trappers Association, National Trappers Association, and Fur Takers of America, Inc.

---

       This case is the second installment in a dispute over the impact that Minnesota's trapping regulations have on the state's population of Canada lynx. A different court in this District previously ordered the Minnesota Department of Natural Resources to apply

for a permit from the federal government that would allow "incidental take[s]" of the lynx and, pending a decision on that application, to adopt new trapping regulations meant to protect the lynx.  In this case, the Center for Biological Diversity claims that the agency has not obtained a permit and that its revised regulations continue to cause unlawful harm to the lynx.

The Center and the DNR seek approval of a consent decree.  Under the proposed decree, the DNR would impose additional restrictions on trapping activities in the geographic area known as the Lynx Management Zone in northeastern Minnesota.[1] Three organizations representing the interests of trappers—the Minnesota Trappers Association, the National Trappers Association, and the Fur Takers of America, Inc.— have intervened in the case as defendants and oppose entry of the decree.  The decree will be approved because it is procedurally and substantively fair, reasonable, and consistent with the governing law.

I

The Canada lynx is a "rare wild cat" known for a distinctive appearance "characterized by tufted ears, hind legs that appear longer than front legs, and a pronounced goatee under the chin."  ECF No. 1 ¶ 13.  An estimated "50 to 200 lynx" reside in northern Minnesota, which is "one of the few places left in the United States that contains lynx habitat with the quality and quantity to sustain lynx populations."  *Id.* ¶ 15.  Since 2000, the Fish and Wildlife Service—one of the federal agencies responsible

---

[1]     The Lynx Management Zone is essentially all of Minnesota east of a line running along U.S. Highway 53 from Duluth to International Falls.  ECF No. 111 at 94.

for administering the Endangered Species Act ("ESA")—has considered the lynx to be a "threatened" species. *Id.* ¶ 14; *see* 16 U.S.C. § 1533(a); 65 Fed. Reg. 16,052 (Mar. 24, 2000). This designation gives the species certain protections under the ESA—most notably, it makes it unlawful for "any person subject to the jurisdiction of the United States" to "take" the species "within the United States." 16 U.S.C. § 1538(a)(1)(B); 50 C.F.R. §§ 17.31(a), 17.40(k). The term "take" encompasses a wide range of actual or attempted conduct, including "trap[ping]." 16 U.S.C. § 1532(19); *see Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 697–99 (1995).

The Center for Biological Diversity is a "nonprofit organization dedicated to the protection and restoration of biodiversity." ECF No. 1 ¶ 5. At least some of its members "live, work, recreate, and study in areas throughout the lynx's current range in Minnesota." *Id.* ¶ 8. These members "enjoy seeing lynx . . . and would like to see the lynx population fully recover in Minnesota and across the country." *Id.*

Hoping to vindicate these interests, the Center and another organization sued the DNR in 2006, claiming that the DNR, through its regulations, was "authorizing trapping that resulted in illegal incidental take of Canada lynx" in violation of the Endangered Species Act. *Id.* ¶ 22; *see* ECF No. 16-1, Ex. 1. Judge Davis eventually agreed, granting the Center's motions for summary judgment and injunctive relief. *See Animal Prot. Inst. v. Holsten*, 541 F. Supp. 2d 1073, 1081–82 (D. Minn. 2008). He ordered the DNR to

> promptly take all action necessary to insure no further taking
> of threatened Canada Lynx . . ., including, but not limited to:

> applying for an incidental take permit[2] for Canada Lynx on
> or before April 30, 2008 . . . and developing and preparing a
> proposal . . . to restrict, modify or eliminate the . . . incidental
> taking of Canada Lynx through trapping activities in the core
> Canada Lynx ranges.

*Id.* at 1081.

In response to that initial order, the DNR applied for an incidental take permit from the Fish and Wildlife Service and submitted a regulatory proposal to the court. ECF No. 1 ¶ 25; *see* ECF No. 16-3. Judge Davis then ordered the DNR to promulgate its proposed regulations, with a few modifications not relevant here, on an emergency basis so that they would take effect by October 25, 2008. ECF No. 16-6. These updated regulations were to remain in effect until one of four things happened: (1) the DNR received an incidental take permit; (2) the Fish and Wildlife Service issued a more general rule addressing incidental take of the lynx; (3) the lynx was delisted from protection under the Act; or (4) the court ordered otherwise. *Id.* at 4–5. To date, although fourteen years have passed, the Fish and Wildlife Service has not acted on the DNR's permit application "despite the DNR's repeated requests that it do so," nor has it taken any of the other regulatory actions that Judge Davis contemplated in his order. ECF No. 1 ¶ 27; ECF No. 16-9 at 4.

---

2       An incidental take permit insulates the permit holder from liability under the Endangered Species Act for takings that are "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). In order to obtain one, an applicant must show that it will take steps to mitigate the impacts of such takings. *See id.* § 1539(a)(2)(A).

4

In December 2020, the Center filed this action.  In the Complaint, it acknowledges that the DNR has complied with Judge Davis's order, but it alleges that the agency's amended regulations have proven ineffective.  *See* ECF No. 1 ¶¶ 30, 37–39.  Specifically, although the DNR does not directly authorize the trapping of lynx, it "oversees licensing and regulation of trapping" for a variety of other species, and "[l]ynx are vulnerable to being caught in traps set for these other animals."  *Id.* ¶¶ 31–36.  A number of lynx have been injured or killed by otherwise lawful traps, and because the DNR has not obtained an incidental take permit, the Center believes that the agency is continuing to violate the Endangered Species Act.  *Id.* ¶¶ 41–55, 61–65.

The DNR responded by filing a motion to dismiss the Complaint for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted.  ECF No. 13.  The Motion to Dismiss was denied.  To summarize, I determined that the Center had pleading-stage standing to raise its claim because it adequately alleged an injury in fact, that the DNR is causing its injury, and that the relief requested by the Center would redress its injury.  *Ctr. for Biological Diversity v. Strommen*, No. 20-cv-2554 (ECT/BRT), 2021 WL 3683491, at *3–4 (D. Minn. Aug. 19, 2021).  Though it was "a close call," I determined that the Center was not precluded from bringing this case by virtue of the judgment in the Center's prior lawsuit before Judge Davis and principles of *res judicata*.  *Id.* at *4–5.  Finally, I determined that the Center's allegations of past lynx takings "plausibly show[ed] that it is 'likely that additional takings may occur unless further regulations are implemented,'" *id.* at *7 (quoting *Animal Prot. Inst.*, 541 F. Supp. 2d at 1081), and that this was "enough to state a plausible claim

for declaratory and injunctive relief," *id.*; *see also Ctr. for Biological Diversity v. Otter*, No. 1:14-CV-258-BLW, 2018 WL 539329, at *2 (D. Idaho Jan. 24, 2018); *Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70, 99 (D. Me. 2008).

On September 23, 2021—a little over one month after the denial of its motion to dismiss—the DNR answered the Complaint, and the litigation moved forward. *See* ECF Nos. 35, 36. In addition to whatever discovery may have been taking place, the docket reflects that the Center and DNR engaged in extensive settlement discussions. The Center proposed a "framework for settlement" on September 3, 2021. ECF No. 32 at 5. In late January 2022, the parties reported that they were "working well together towards settlement." ECF No. 39. In light of the parties' reported progress, the fact-discovery deadline was extended "to allow the parties to concentrate on settlement." *Id.*; *see also* ECF No. 40.

On February 18, 2022, the Minnesota Trappers Association, National Trappers Association, and Fur Takers of America, Inc. ("the Trappers") moved to intervene. ECF No. 41. In support of their motion, the Trappers argued primarily that restricting trapping in the ways sought by the Center would significantly and adversely affect their rights and the rights of their members to trap in Minnesota and that the DNR, "as the regulator of trapping in Minnesota[,] do[es] not adequately represent the interests of" either the Trappers or their members. ECF No. 43 at 1–2. Neither the Center nor the DNR opposed the Motion. *See* ECF Nos. 44, 48, 53. Magistrate Judge Docherty granted the Motion to Intervene on March 9, 2022. ECF No. 57.

The Center and the DNR filed a joint motion seeking approval and entry of the proposed consent decree on June 1, 2022. ECF No. 71. Relevant here, the proposed decree requires the DNR to "maintain . . . the trapping restrictions that are currently in effect in the Lynx Management Zone as a result of the Court's Order in *Animal Protec. Inst. v. Holsten*, No. 06-CV-3776 (MJD/RLE), ECF No. 163 (July 14, 2008)," and incorporates the terms of that Order. ECF No. 72 ¶¶ 7, 8. In addition, the proposed decree adds restrictions as follows:

> By whatever regulatory means are necessary, including expedited emergency rulemaking, the DNR shall, within 40 days after this Decree becomes effective, publish a rule in the State Register that imposes the following additional restrictions on trapping activities in the geographic area known as the Lynx Management Zone, as defined in Minn. R. 6234.1000, subp. 5:
>
> a. In the Lynx Management Zone, snares, except when placed as water sets, must be equipped with: (i) a minimum loop stop that prevents the snare loop from closing to a diameter less than 3 ¼ inches; and (ii) a one-piece snare lock that contains no moving parts, has no integrated or attached compression springs, and has a side that contacts the animal that is a minimum of ½ inch in width.
>
> b. In the Lynx Management Zone, snares, except when placed as water sets, may not be attached or anchored to a fence or tree, and may not be set in a location such that they, when fully extended, can reach any part of a fence, or any rooted vegetation greater than ½ inch in diameter.
>
> c. In the Lynx Management Zone, snares, except when (i) placed as water sets or (ii) used by a licensed wolf trapper as a "wolf snare" within the meaning of Minn. R. 6234.0900, subp. 6, may not exceed 7 feet in length

from the anchor point to the end of the snare when
fully extended.

d. In the Lynx Management Zone, snares, except when
placed as water sets, must be equipped with at least 1
swivel.

e. In the Lynx Management Zone, a person may not set,
place, or operate any foothold trap that has a maximum
jaw opening, when set, of greater than 6 ½ inches
measured from the inside edges of the jaw, except
when (i) placed as a water set or (ii) used by licensed
wolf trappers during a wolf season.

*Id.* ¶ 6.  The proposed decree also requires the DNR to take several steps aimed at
educating the public, such as issuing a press release and including the new restrictions on
its website.  *Id.* ¶¶ 9, 10.

The Trappers promptly objected to the proposed decree on several grounds and
requested either that the motion be denied or, alternatively, that an evidentiary hearing be
scheduled on the decree.  ECF No. 76.  The Trappers' request for an evidentiary hearing
was granted, ECF No. 83, and in consultation with the parties, a hearing was scheduled
for and occurred on November 3, 2022, ECF Nos. 84, 106.

Two witnesses testified at the hearing, Dr. John D. Erb on behalf of the DNR and
Mr. Bert Highland on behalf of the Trappers.  *See generally* ECF No. 111 ("Tr.").  Dr.
Erb has a Ph.D. in Zoology and Physiology and has been a wildlife biologist at the DNR
for nearly 25 years.  ECF No. 113 at 9; Tr. 9–10.  He is a member of an Association of
Fish and Wildlife Agencies sub-group—the furbearer resources technical work group—
and he has served as chair of the group for the past six years.  ECF No. 113 at 9–10.
Dr. Erb has published numerous trapping-related research papers and has been trapping

8

personally for over 40 years.  Tr. 13–17; *see* D-2, D-24,[3] D-27, D-29.  Mr. Highland testified based on nearly sixty years' worth of trapping experience, Tr. 183, his lengthy membership and participation in trapping-advocacy organizations, *id.* 189, and his fifteen years' experience educating and providing instruction in the areas of trapping, snaring, and related regulations, *id.* 192–93.

All Parties were present at the hearing and participated in questioning the witnesses.  *See id.* 2.  At the hearing's conclusion, additional briefing was requested and scheduled.  *Id.* 232–37.  The briefing was completed on January 10, 2023.  *See* ECF Nos. 116, 117.

## II

### A

The general rules governing a federal district court's discretionary consideration of a proposed consent decree are settled.  A federal district court cannot merely "rubber stamp" a consent decree but must instead "carefully consider[] the underlying facts and legal arguments."  *United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1019 (8th Cir. 2002).  At the same time, "[a] consent decree is not reviewed as a judgment on the merits."  *United States v. Metro. St. Louis Sewer Dist. (MSD)*, 952 F.2d 1040, 1044 (8th Cir. 1992).  "Consent decrees should: spring from—and serve to resolve—a dispute

---

[3]  The Trappers filed a motion in limine to exclude certain proposed exhibits.  ECF No. 95.  In this motion, the Trappers contend that several exhibits the Center and DNR sought to introduce are irrelevant or more prejudicial than probative.  ECF No. 98 at 3.  This motion will be denied.  The exhibits are relevant to understanding the mechanics of trapping and the proposed regulations' effect on the lethality of snares.  Particularly in view of the non-jury nature of this proceeding, these exhibits are not unduly prejudicial.

within the court's subject-matter jurisdiction; come within the general scope of the case from the pleadings; and, further the objectives of the law on which the complaint was based." *E.E.O.C. v. Prod. Fabricators, Inc.*, 666 F.3d 1170, 1173 (8th Cir. 2012) (citing *Local Number 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 525 (1986)). "When reviewing a proposed consent decree, the trial court is to review the settlement for [procedural and substantive] fairness, reasonableness, and adequacy." *Metro. St. Louis Sewer Dist.*, 952 F.2d at 1044; *see also Prod. Fabricators*, 666 F.3d at 1172 (same); *BP Amoco Oil PLC*, 277 F.3d at 1018 ("Reasonableness, fairness, and fidelity to the statute are . . . the horses which district judges must ride.") (quotation omitted). A district court abuses its discretion "'when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment.'" *Prod. Fabricators*, 666 F.3d at 1172 (quoting *Kern v. TXO Prod. Corp.*, 738 F.2d 968, 970 (8th Cir.1984)).

B

The Trappers advance essentially five arguments against the proposed decree: (1) they object to the rulemaking required under the decree; (2) they argue that the new regulations proposed in the decree would not prevent further lynx mortality; (3) they object to the loop-stop requirement in paragraph 6(a)(i) of the proposed decree; (4) they object to the lock requirement in paragraph 6(a)(ii); and (5) they object to the anchoring

restrictions in paragraph 6(b).  I understand these objections implicate the proposed decree's reasonableness, and perhaps its substantive fairness as well.

Before addressing these objections, it is important to identify objections the Trappers do not make.  The Trappers do not object to the standing, *res judicata*, or merits determinations in the order denying the DNR's dismissal motion.  In other words, the Trappers do not argue that any one of these defenses provides a basis to challenge the proposed decree on the grounds that it is inconsistent with the ESA or unfaithful to the law in some other respect, meaning there is no reason to revisit the analysis underlying the decisions on these issues in that order.

Nor do the Trappers challenge the decree's procedural fairness.  This makes sense. Whether a consent decree is procedurally fair is answered by examining the settlement process and determining whether the parties' negotiations were "in good faith and at arm's length."  *BP Amoco Oil*, 277 F.3d at 1020.  In their joint motion to enter the decree, the Center and DNR assert that "the proposed decree is the result of good-faith, arm's length negotiations . . . that spanned more than seven months and involved significant input by subject matter experts."  ECF No. 71 ¶ 7.  The Center and DNR further assert that they "were represented throughout the negotiations by counsel with significant experience in environmental law."  *Id.*  The extensive record in this case gives no reason to question these assertions' accuracy.  Now turn to the Trappers' objections.

1

The Trappers characterize the proposed decree as requiring "'expedited emergency rulemaking'" under Minn. Stat. § 97A.0451, subdiv. 1.  ECF No. 115 at 4.

From that jumping-off point, the Trappers argue that a different statute, Minn. Stat. § 14.388, requires there to "be 'good cause' for an agency to utilize exempt rulemaking rather than traditional notice-and-comment rulemaking." *Id.* And the Trappers argue that the "good cause" required under § 14.388 requires demonstrating "'(1) that there is a serious and immediate threat to public health, safety, or welfare; (2) that the rules address that threat; and (3) that it would be contrary to the public interest to follow the usual rulemaking procedures.'" *Id.* at 4–5 (quoting *Jewish Cmty. Action v. Comm'r of Pub. Safety*, 657 N.W.2d 604, 608 (Minn. Ct. App. 2003)). The implication seems to be that the Center and DNR have not identified evidence meeting these assertedly essential elements and that this failure warrants the proposed decree's rejection. The Trappers also assert that the rulemaking contemplated by the decree will prevent the public from participating in the rulemaking process. *Id.* at 5.

These arguments are not persuasive. The Trappers' assertion that the "good cause" requirement in Minn. Stat. § 14.388 applies to the DNR's emergency rulemaking powers under Minn. Stat. §§ 97A.0451 to 97A.0459 is not correct. Those emergency rulemaking provisions nowhere reference § 14.388 or a similar "good cause" requirement as a prerequisite for the exercise of emergency rulemaking powers. Regardless, the DNR has made clear its intention to adopt the additional trapping restrictions described in the proposed decree—not under §§ 97A.0451 to 97A.0459—but through "expedited emergency rulemaking" under Minn. Stat. § 84.027, subdiv. 13(b). *See* ECF No. 72 ¶¶ 6, 11; ECF No. 80 at 6–11. Though the DNR explains at some length the various justifications for pursuing rulemaking under the authority granted in § 84.027, subdiv.

12

13(b), the Trappers do not meaningfully respond to or contest the DNR's specific justifications. Importantly, they do not argue that the DNR's exercise of this rulemaking power would be legally improper.[4] The Trappers' assertion that the public will be prevented from participating in the rulemaking process seems beside the point and incorrect. The Trappers have had a complete opportunity in this case to raise any objections they or their members might have to the proposed decree and its additional regulations. And in the decree, the Center and the DNR "recognize that the additional trapping restrictions set forth in Paragraph 6 may be challenged." ECF No. 72 ¶ 11.

2

The Trappers argue that the proposed decree is unreasonable because "neither Plaintiff nor Defendant have identified a 'harmed' lynx since 2008 (the *Holsten* case) that the consent decree's rules would have prevented." ECF No. 115 at 6. In other words, though the Trappers do not dispute that at least nine Canada lynx have been taken—*i.e.*, captured and in some instances killed—in violation of the ESA since 2008, the Trappers contend that the decree is unreasonable because the record does not show that the

---

[4] The precise extent of the DNR's authority to implement the proposed decree's additional trapping restrictions through emergency expedited rulemaking under § 84.027, subdiv. 13(b) is not plainly manifest. This authority may be exercised "[i]f conditions exist that do not allow the commissioner to comply with sections 97A.0451 to 97A.0459." Minn. Stat. § 84.027, subdiv. 13(b). The DNR does not identify these conditions but says it possesses "discretion to determine which rulemaking process [is] appropriate, depending upon the circumstances of the particular wildlife management activity that is the subject matter of the rulemaking." ECF No. 80 at 8. No authority is cited to support this legal proposition, though the DNR identifies several factors justifying the discretionary exercise of its emergency expedited rulemaking power under § 84.027, subdiv. 13(b). To be clear, because the Trappers have not challenged the DNR's authority in this specific respect, this question need not be decided.

decree's additional restrictions would have prevented any one of these takings. *Id.* at 6–9. The contention seems to be that the proposed decree is unreasonable because it does not address all past harms alleged in the Center's Complaint.[5]

This argument overstates what the law requires of a consent decree. The proposed decree is a settlement. As noted, under controlling Eighth Circuit precedent, review of a proposed consent decree must be careful but also limited to determining whether the decree is fair, reasonable, and faithful to the controlling law. *BP Amoco Oil PLC*, 277 F.3d at 1018. A federal court need not "'determine whether [the decree] is the best possible settlement that could have been obtained.'" *Sierra Club v. Entergy Ark. LLC*, No. 4:18-cv-00854, 2021 WL 9455475, at *1 (E.D. Ark. Mar. 11, 2021) (quoting *United States v. Akzo Coatings, Inc.*, 949 F.2d 1409, 1436 (6th Cir. 1991)). This is because "consent decrees are normally compromises in which the parties give up something they might have won in litigation and waive their rights to litigation." *United States v. ITT Cont'l Baking Co.,* 420 U.S. 223, 235 (1975). Thus, a consent decree "must be construed as . . . written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation." *United States v. Armour & Co.,* 402 U.S. 673, 682 (1971).

---

[5]     To be clear, I do not understand the Trappers to argue that the consent decree should go further and impose additional lynx-protecting restrictions. The Trappers' position in this case is that no—or at least fewer—restrictions are appropriate. And the Trappers' witness, Mr. Highland, testified that he does not believe additional trapping restrictions could be put in place to reduce the risk to lynx. Tr. 226. Though Mr. Highland acknowledged that prohibiting trapping entirely in northeastern Minnesota would reduce that risk, *id.*, neither Mr. Highland personally nor the Trappers have advocated for that result.

Viewed through these rules, the compromises reflected in the proposed decree are neither ineffectual nor unreasonable.  As the Center and DNR make clear in their submissions, the proposed decree's "primary goal . . . is to reduce mortality risk to lynx caught in snares."  ECF No. 117 at 4; *see also* ECF No. 116 at 5.  The Trappers do not challenge the decree's probable effectiveness in this respect.  And this goal reflects a reasonable midpoint between the Center and DNR's litigation positions and bears a reasonable relationship to the Center's claims and the DNR's defenses.  In its Complaint, the Center sought a declaration that "the DNR's authorization of recreational and commercial trapping in Minnesota results in the taking of Canada lynx without a permit, in violation of [the ESA]."  ECF No. 1 at 16, ¶ A.  As the Center points out, it "could have sought an injunction prohibiting trapping across lynx habitat in northern Minnesota until the state finally obtains an ITP for its trapping program."  ECF No. 112 at 2.  For its part, the DNR advanced jurisdictional defenses and denied liability outright.  *See Ctr. for Biological Diversity*, 2021 WL 3683491 at *3–7 (describing DNR's defenses); ECF No. 35 ¶¶ 1, 3, 19, and at 30 ¶ 2 (preserving defenses raised in Rule 12 motion).  The proposed decree reflects a reasonable compromise of these competing litigation positions: the Center obtains additional protections against lynx mortality, if not everything it wanted; the DNR obtains a degree of clarity and finality regarding its ESA compliance vis-à-vis the Canada lynx and retains the authority to allow trapping in northeastern Minnesota, though not outright rejection of the Center's case.  Under the controlling rules, these compromises do not make the proposed decree unreasonable.

3

The Trappers object to the requirement in paragraph 6(a)(i) of the proposed decree that "snares, except when placed as water sets, must be equipped with . . . a minimum loop stop that prevents the snare loop from closing to a diameter less than 3 ¼ inches." ECF No. 72 ¶ 6(a)(i).  A loop stop is "a mechanical component on a snare that prevents the loop from being able to close down past a certain diameter."  Tr. 41.  This loop-stop restriction is intended to "eliminate the risk of mortality caused from constriction pressure on the arteries in the neck."  *Id.*

The Trappers argue essentially that the record lacks evidence showing that loop stops would prevent lynx mortality and that Mr. Highland's testimony shows that the requirement is more likely to result in injuries to Canada lynx.  The Trappers suggest that two exhibits the DNR introduced to show that loop stops prevent snare lethality, Exs. D-27 and D-28, are not helpful because they involved studies of different species— wolves and coyotes—undertaken for purposes other than determining snare lethality, ECF No. 115 at 9–10.  The Trappers argue that a third exhibit showing that other states impose a loop-stop requirement, Ex. D-25, carries little weight because Dr. Erb, the Trappers say, admitted that no state identified in the exhibit adopted a loop-stop requirement to reduce lynx mortality.  ECF No. 115 at 10.  The Trappers contend that, with these exhibits discounted, Mr. Highland's testimony to the effect that loop stops cause injuries should be given dispositive weight.  *Id.*

The record supports the loop-stop requirement's reasonableness.  Dr. Erb testified that the requirement "would substantially if not fully eliminate the risk of mortality

caused from constriction pressure on the arteries in the neck" of Canada lynx.  Tr. 41.  To

support this opinion, Dr. Erb cited evidence showing that roughly one-third of states

include a minimum-loop-stop requirement in their trapping regulations.  *Id.* 43; *see also*

Ex. D-25.   He testified that loop stops are typically included in best management

practices for snares for a variety of reasons in addition to reducing the risk of mortality,

and he described testing that supported the inclusion of loop stops in best management

practices for snares.  Tr. 43–45.  He testified that the use of loop stops in snares is not

unethical based on studies showing that loop stops did not cause major injuries and based

on his experience live-restraining wolves without ever observing "any notable injury, any

serious injury, [or] anything of concern."  *Id.* 45–46; *see also id.* 131 (testifying that loop

stops might cause injury in "a rare situation"); ECF No. 96 ¶ 33.[6]  It is true that much of

the evidence Dr. Erb cited to support his opinions concerned regulations, studies, or

experiences with animals other than Canada lynx.   However, Dr. Erb testified that "the

array of injuries that can occur in a trap would be true for any species."  Tr. 75.  Though

the Trappers fairly identify the lack of record evidence specific to the use or effectiveness

---

[6]     The Center submitted the Declaration of Dr. Winston Vickers, ECF No. 96, in place of calling its own witness for live testimony at the evidentiary hearing.  ECF No. 94.  Dr. Vickers is a wildlife research veterinarian with the University California, Davis Wildlife Health Center and the Institute for Wildlife Studies in California.  ECF No. 96 ¶ 1.  He "ha[s] been an active veterinarian with experience with zoo, large and small domestic, exotic, and wild species for 44 years."  *Id.*  The Trappers moved to exclude Dr. Vickers's declaration.  ECF No. 95.  This motion will be denied because consideration of Dr. Vickers's opinions is neither unfair nor prejudicial.  Dr. Vickers's declaration corroborates certain aspects of the testimony of Dr. Erb, who was available for cross-examination at the hearing.   In other words, had the Trappers' cross-examination undermined or called into question Dr. Erb's testimony, I would have considered it to have that same effect on Dr. Vickers's declaration testimony.

of loop stops with respect to Canada lynx, they cite no evidence and advance no persuasive argument to show why the evidence Dr. Erb cited regarding other species does not support his lynx-specific opinions.

Mr. Highland's testimony regarding the loop-stop requirement was credible and informed, but I do not find that his testimony either undermines Dr. Erb's testimony or establishes the unreasonableness of the loop-stop requirement.  As noted earlier, Mr. Highland testified based on nearly sixty years' worth of trapping experience, *id.* 183, his lengthy membership and participation in trapping-advocacy organizations, *id.* 189, and his fifteen years' experience educating and providing instruction in the areas of trapping, snaring, and related regulations, *id.* 192–93.  Given his extensive experience and service in these areas, it would be a mistake to dismiss Mr. Highland's testimony—as the DNR argues I should—simply because he "is not a wildlife research veterinarian" or a "wildlife research biologist."  ECF No. 113 at 12.  Regardless, Mr. Highland's opinion that a loop stop could cause undue discomfort to an animal, including edema, was not supported by evidence showing the frequency with which this occurs, and he was not asked to address or respond to the studies and other information introduced with Dr. Erb's testimony.  *See* Tr. 199–200.  Without more, it would be unwise to conclude that Mr. Highland's testimony materially undermines Dr. Erb's opinion that that the proposed decree's loop-stop requirement "would substantially if not fully eliminate the risk of mortality caused from constriction pressure on the arteries in the neck" of Canada lynx. Tr. 41.

4

The Trappers next object to the requirement in paragraph 6(a)(ii) of the proposed decree that "snares, except when placed as water sets, must be equipped with . . . a one-piece snare lock that contains no moving parts, has no integrated or attached compression springs, and has a side that contacts the animal that is a minimum of ½ inch in width." ECF No. 72 ¶ 6(a)(ii).  A "snare lock" is "an attachment to the cable" that prevents the loop "from opening back up after the animal has pulled it tight."  Tr. 48.  As Dr. Erb testified, the proposed rule would outlaw use of "a cam lock . . . specifically created to be more of a killing-style lock" that is less likely to loosen after an animal is snared.  *Id.* 49.  The proposed rule's half-inch minimum-width requirement would spread the snare's constrictive force at the lock point "across a larger surface."  *Id.* at 50–51.

The Trappers argue that this requirement is unreasonable because it would prohibit trappers from using "cam locks [which] are by far the number one choice for trappers," would burden trappers with "undue burden and expense," would cause needless injuries to snared animals, and "is not specifically tailored to remedy any of the past take of lynx in Minnesota."  ECF No. 115 at 10–11.

The record does not support these objections.  At the hearing, the DNR introduced a survey—entitled "Trap Use, Furbearers Trapped, and Trapper Characteristics in the United States in 2015."  Ex. D-26.  The survey, conducted on behalf of the Association of Fish and Wildlife Agencies with the "input, support, and guidance" of the National Trappers Association and the Fur Takers of America, *id.* (under "Acknowledgments"), "collect[ed] updated information and trend data regarding the use of traps nationally,

regionally, and by state," *id.* at i.  The data gathered during the survey showed that 17% of trappers in the "Midwest" region (which included Minnesota) used a cam lock.  *Id.* at 101.  The data strongly suggested, in other words, that cam locks are not "by far the number one choice for trappers" in Minnesota, as the Trappers suggest, ECF No. 115 at 10, and showed that several of the more popular snare locks will remain lawful under the proposed decree, Tr. 51–53; *see also* ECF No. 96 ¶ 36.  The Trappers do not address this data.

Nor does the record support the Trappers' undue burden/expense objection. Dr. Erb and Mr. Highland essentially agreed that the cost of a single snare lock is no more than fifty cents.  Dr. Erb testified that "they can range from 15 to 40 cents apiece . . . [and] average $4 a dozen or something like that."  Tr. 75.  Mr. Highland agreed that "a snare lock roughly costs between 50 and 40 cents a lock."  *Id.* 217–18. The record contains no evidence tending to show that these costs are unduly burdensome either considered alone or in comparison to the lock style the proposed decree would prohibit.

The Trappers support their contention that the cam-lock prohibition would cause needless injuries to animals by relying on Mr. Highland's testimony that "with the wider lock there's more chance of that underfur of the animal getting caught in there, so in fact it would act as a restraining device and not put the animal down."  *Id.* 201; *see* ECF No. 115 at 10–11.  For two reasons, this testimony does not support the Trappers' objection. First, the testimony seems to support the idea that a wider lock decreases a snare's lethality, and that is the point of the proposed decree's cam-lock prohibition.  Second, on

cross-examination, Mr. Highland seemed to clarify that his concern with this aspect of the decree is not that it would cause injury, but that a larger lock makes a snare "harder to hide from the animal, the target animal." Tr. 218. That is not an objection the Trappers appear to make. If they did, Dr. Erb's testimony that trappers are capable of camouflaging snares, and that the DNR has successfully snared wolves with "about the largest lock that there is" without difficulty, would rebut it. *Id.* 54; *see also* ECF No. 96 ¶ 37.

The Trappers objection that the cam-lock restriction "is not specifically tailored to remedy any of the past take of lynx in Minnesota," ECF No. 115 at 11, repeats the legal problem discussed in Part II.B.2, above. To be reasonable, a consent decree need not be "specifically tailored" or include measures that would remedy every complained-of violation. As explained, both the decree as a whole and this particular restriction reflect a reasonable, midpoint compromise of the Center and DNR's litigation positions.

5

The Trappers' final objection is to the requirement in paragraph 6(b) of the proposed decree that "snares, except when placed as water sets, may not be attached or anchored to a fence or tree, and may not be set in a location such that they, when fully extended, can reach any part of a fence, or any rooted vegetation greater than ½ inch in diameter." ECF No. 72 ¶ 6(b). These restrictions too are intended "to reduce the mortality risk if a lynx is caught in a cable." Tr. 56. As Dr. Erb explained, the restriction reduces the risk of "entanglement":

So whether it is a fence, fence post, larger-diameter brush, this is often referred to in trapping as entanglement, something that the animal once caught could get entangled around, and the basic principle is, well, there's multiple ways it could occur.

But one example is an animal could wind itself around a tree tight, be next to that object, be able to garner more leverage to push further and tighten the snare more.

Another is, say an animal – there's a, say, one-inch diameter sapling, two-inch diameter sapling and the animal wraps around it and pulls. That sapling can bend over. The cable can slide up, get over a branch and it can create some lifting pressure that could in many situations result in the animal having one foot or two feet suspended off the ground, where even with the stop now the animal's weight is pushing down onto the arteries. And so this entanglement for various reasons is known. It's well-known amongst the trapping community that entanglement is a way to increase lethality of snares, and so that's designed to minimize the use of rooted plants or fence posts – not using, but having that present in the area where the snare can reach it.

*Id.* 57; ECF No. 96 ¶ 41 ("[Paragraph b] serves to prevent a captured animal from choking itself by repeatedly wrapping the cable around the post or tree or by hanging itself by leaping over a fence or branch.").

Based on Mr. Highland's testimony, the Trappers assert that "prohibiting the anchoring of snares to woody vegetation in the Lynx Management Zone and limiting cables to a length of 7 feet would eliminate any meaningful snaring in the region." ECF No. 115 at 11. The Trappers say this is because a trapper's primary alternate option (to anchoring a snare to vegetation or a fence post) is to anchor the snare to a stake, but the glacial rock throughout the Lynx Management Zone and the frozen ground trappers encounter during and around the winter months make the task of driving a stake into the

ground impractical.  *Id.* at 11–12.  The Trappers also assert that this restriction would require snares to be placed in open locations where target animals like fox, coyote, or bobcat do not go.  *Id.* at 12.

The Trappers do not dispute that this restriction would, as Dr. Erb testified, reduce the mortality risk of snared lynx.  Mr. Highland agreed that entanglement increases lethality and that this proposed change would reduce lethality associated with entanglement.  Tr. 221–22.  The issue therefore boils down to whether the burdens described by Mr. Highland are sufficiently substantial to warrant finding that the proposed decree is not reasonable.  They are not.  Dr. Erb acknowledged the challenge associated with driving stakes into frozen ground in winter.  *Id.* 58.  But he also testified that he and others he works with through the DNR have done that "on a regular basis" citing as one example in connection with "wolf live-trapping research."  *Id.* 59; *see also* ECF No. 96 ¶ 40.  Dr. Erb acknowledged that trappers prefer to set snares amid rooted vegetation because it "funnels the [target] animal through points."  Tr. 59.  But he also described how trappers can separate vegetation from its roots and leave it in place to achieve the same effect and that "the use of grass, smaller things nonrooted, is a common tool [used] anyway by trappers when setting snares and that can be used here."  *Id.* at 60.  On this record, I conclude that the burdens the Trappers identify are reasonably capable of being addressed and not so great as to require rejection of the proposed decree.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS**

**ORDERED THAT**:

1.      Plaintiff's and Defendant's Joint Motion for Entry of Consent Decree [ECF No. 71] is **GRANTED**.

2.      Plaintiff's Motion to Consider Declaration [ECF No. 94] is **GRANTED**.

3.      Intervenor Defendants' Motion in Limine [ECF No. 95] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  February 21, 2023                    s/ Eric C. Tostrud
                                             Eric C. Tostrud
                                             United States District Court